## COMMISSIONER OF INTERNAL REVENUE v. SWENSON.

### No. 6143.

Circuit Court of Appeals, Fifth Circuit.

March 5, 1932.

Rehearing Denied April 5, 1932.

G. A. Youngquist, Asst. Atty. Gen., Sewall Key and A. H. Conner, Sp. Assts. to the Atty. Gen., C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and Bruce A. Low and Robt. L. Williams, Sp. Attys., Bureau of Internal Revenue, all of Washington, D. C., for petitioner.

E. D. Gatlin, of Breckenridge, Tex., and Sidney L. Samuels, of Fort Worth, Tex., for respondent.

Before BRYAN, FOSTER, and WALKER, Circuit Judges.

WALKER, Circuit Judge.

The Commissioner of Internal Revenue assessed a deficiency of income tax for the year 1919 against the appellee as executor of the estate of Christina Swenson, deceased. That assessment was a result of a finding by the Commissioner that 2,400 shares of the capital stock of the Swensondale Oil Company, a Texas corporation (herein referred to as the corporation), received in 1919, for an oil and gas lease on 414 acres of land, owned in community by the taxpayer and her husband, Peter Swenson, had at the time of that transaction a fair market value of $240,000. Upon appellee's petition for a redetermination of such assessment, the Board of Tax Appeals held that the stock received in exchange for the oil and gas lease had no fair market value at the time of its receipt, and abated the assessment accordingly. That action of the Board of Tax Appeals is before us on the Commissioner's petition for review.

Uncontroverted evidence adduced in the hearing before the Board of Tax Appeals showed the following: During the years 1918 and 1919 the taxpayer and her husband owned under the community property laws of Texas about 3,500 acres of land, located in one body, in Stephens county, all of which were acquired prior to the year 1913. At the time those lands were acquired, it was not known or supposed that lands in that part of Texas contained oil or gas. In November, 1918, after the discovery of oil in the part of Texas in which those lands are located, Peter Swenson associated with himself eight other persons and organized the corporation, with an authorized capital of 3,000 shares of stock of the nominal par value of $100 each. The eight associates of Peter Swenson subscribed, at par, for 940 shares of the corporation's stock, and paid therefor the sum of $94,000. Of the remaining 2,060 shares 1,800 were issued to Peter Swenson for an oil and gas lease covering 1,093 acres of the above-mentioned land. From the proceeds of the stock sold, the Swensons received $10,000 in cash. Ten shares of that stock were issued to S. T. Swenson, a son of Peter Swenson, and 250 shares were issued to two persons jointly, as a promotion fee. The agreement under which the corporation was organized and the lease executed provided that, should oil be discovered, the Swensons should receive as a royalty one-eighth of the commercial oil produced from the land covered by the lease. At the time the corporation was organized, no oil was known to exist nearer the Swensons' land covered by the lease than about 2½ miles. The corporation began drilling on the leased land on February 22, 1919, using for that purpose cash acquired from the sale of its stock. From the time of the beginning of the drilling operations the corporation intended to drill to a depth of 3,200 to 3,500 feet, unless oil in paying quantity should be found at a less depth. By April 14, 1919, that well had been drilled to the depth of about 2,200 feet without oil having been discovered. At that time the physical condition of the well was not satisfactory, gas pressure and salt water having been encountered at a depth of about 1,950 feet, and heavy expenses had been incurred in shutting off the gas and water, with a result that the corporation's cash resources were so reduced as to make it doubtful whether it would be financially able to undertake the drilling of another well in case of the first one being a failure. At that time seven or eight other wells were being drilled or had been drilled by other companies in territory surrounding the land covered by the above-mentioned lease, three northeasterly, one to the southeast, one south, and one to the west. Some of those wells were producing oil and others were not. Those to the north and northeast of the corporation's well were the more productive; those to the south and west less so, or failing altogether. Such were the circumstances when it was determined to increase the capital stock of the corporation from the original amount of 3,000 shares to 14,000 shares, and on April 14, 1919, Peter Swenson and his wife, the taxpayer, offered to the corporation an oil and gas lease on an additional tract of land containing 414 acres, as a basis for an increase in the capitalization of the corporation. On April 17, 1919, that lease was accepted by the corporation, the stockholders voting an increase of 11,000

shares in its capitalization, making the total number of shares 14,000, of the par value of $100 each. By the terms of the offer and acceptance, Peter Swenson and his wife, the taxpayer, subscribed for 2,400 shares, at par, of the increased capitalization, to be paid for with the oil and gas lease on the additional tract of 414 acres; 6,000 of the new shares to be issued to the holders of the original shares, making a 200 per cent. stock dividend on the last-mentioned shares; and 2,350 of the new shares were to be sold at par. By May 15, 1919, all of the new shares which were to be offered for sale at par had been subscribed for, to be paid for in cash to the corporation, and $81,300 of the amount so agreed to be paid had actually been paid in cash. On the same day, May 15, 1919, the directors of the corporation closed such stock subscriptions and applied for an amendment of its charter providing for the increased capitalization upon the above-mentioned basis. In that application that lease was arbitrarily stated to have a reasonable value of $865,000 or more. Up to May 15, 1919, no oil had been discovered anywhere on the land of the corporation or on land belonging to Peter Swenson and his wife, or anywhere nearer to such land than approximately 2½ miles. On April 17, 1919, and on May 19, 1919, and at all times between those dates, the corporation had no assets other than the two above-mentioned oil leases, some drilling machinery, largely secondhand, and such part of the cash actually paid to it on stock subscriptions as had not been expended in drilling its first test well. It had no income whatever. During the time that the corporation was capitalized at $300,000 par value, and after the increase in its capital to $1,400,000 par value, Peter Swenson and his wife, the taxpayer, owned a substantial majority (approximating 60 per cent.) of its capital stock. They never sold any of this stock for money or property of any kind. On May 18, 1919, the above-mentioned well on land included in the first-mentioned lease came in, and proved to be a large oil producer.

At and prior to the time of the execution of the above-mentioned lease covering the tract containing 414 acres, there were numerous producing wells and many other wells in process of being drilled in the immediate vicinity of that land. In April and May, 1919, there was increased activity in the leasing of lands in the territory surrounding the Swenson lands. With the exception of the Swenson land, all but a few small tracts in isolated places had been leased, and unsuc-cessful efforts had been made to lease the Swenson land. In 1918, prior to the organization of the corporation, Peter Swenson received an offer of $1,000,000 cash for his land, supposed to include about 5,000 acres, with a one-eighth royalty interest; the prospective purchaser agreeing to drill ten wells on the property. Peter Swenson was unwilling to part with his control of the right to oil and gas in the land owned by himself and his wife, and did not want any of the big oil companies to acquire stock in the corporation to which he made leases. Several witnesses, who qualified as experts in the business of oil and gas leasing, testified that at the time of the execution of the last-mentioned lease an oil lease on that land was worth from $700 to $1,200 per acre, and that, if that land had been cut up into three or four parts, all the leases on it would have been worth as high as $1,500 per acre. That part of the increased capital stock of the corporation which, under the plan adopted, was to be sold, was offered for sale only to those who already were stockholders and to persons satisfactory to the Swensons and their original associates. It was agreed among them that the sale of that stock to outsiders should be confined to small buyers in order to keep out the big oil companies, which were trying to buy the stock and which had acquired interests all around the Swenson property. The new stock was allotted to the old stockholders, and most of it was bought by them, some of them taking more of the new stock than their allotment. The part of the new stock not taken by the old stockholders was bought by subscribers who were acceptable to Peter Swenson and his associates. The evidence showed that some of that stock was bought after the buyer had had an oil expert to make an investigation of the territory in which the land covered by leases to the corporation was located.

The Revenue Act of 1918 (40 Stat. 1057, 1060) provided:

"Sec. 202. (a) That for the purpose of ascertaining the gain derived or loss sustained from the sale or other disposition of property, real, personal, or mixed, the basis shall be—

"(1) In the case of property acquired before March 1, 1913, the fair market price or value of such property as of that date; and
* * *

"(b) When property is exchanged for other property, the property received in exchange shall for the purpose of determining gain or loss be treated as the equivalent of

cash to the amount of its fair market value, if any. * * * "

Treasury Regulation 45, promulgated under that act, provided:

"Art. 1566. *Exchange of Property and Stock.*—Where property is transferred to a corporation in exchange for its stock, the exchange constitutes a closed transaction and the former owner of the property realizes a gain or loss if the stock has a market value, and such market value is greater or less than the cost or the fair market value as of March 1, 1913 (if acquired prior thereto), of the property given in exchange. * * * "

▉▉ It appears from the opinion rendered by the Board of Tax Appeals that the fact that all of the increased capital stock which was offered for sale on April 17, 1919, was sold at par by May 15, 1919, was excluded from consideration as evidence of the market value of the 2,400 shares of that issue received in exchange for the lease covering the tract containing 414 acres, because the shares sold were not offered on the general market, but were sold at private sale to acquaintances of one or more of the old stockholders; and that, in reaching the conclusion that no market value could be attributed to the stock received in exchange for the last-mentioned lease, the Board was influenced by the view that the speculative nature of the property for which that stock was exchanged kept that stock from having a market value. Expressions contained in that opinion indicate that the Board did not attribute prima facie correctness to the Commissioner's determination, and assumed or concluded that the burden was on the Commissioner to prove that at the time of the consummation of the last-mentioned lease the stock received in exchange therefor had a fair market value and what that market value was.

The evidence did not show the existence in fact of the ground relied on for excluding from consideration the circumstance that practically contemporaneously with the execution of the last-mentioned lease 2,350 shares of stock of the same issue as that received in exchange for that lease were sold at par. Most of those shares were bought by holders of the original stock of the corporation, only such of those shares as were not bought by original stockholders being offered for sale, and sold, to selected persons. The fact that corporate shares were readily sold at par is not kept from being evidence that other shares of the same issue had substantial market value at or about the time of such sale or sales by the circumstances that none of that stock was offered for sale to the general public, and that such of it as was sold was bought by holders of previously issued stock of the corporation and by other selected persons whose participation in the ownership of the stock of the corporation was desired by those in control of the corporation. The fact that such sales were so made had some tendency to prove that there was a market for the shares of stock received in exchange for the lease (which at par for the stock amounted to substantially more than $500 per acre), and that these shares could have been sold at a substantial price if they had been offered to the public for sale at that time. Penney & Long v. Commissioner of Internal Revenue (C. C. A.) 39 F.(2d) 849; O'Meara v. Commissioner of Internal Revenue (C. C. A.) 34 F.(2d) 390, 395. The conclusion that the 2,400 shares received in exchange for the lease had no market value at the time of the exchange well may be regarded as being inconsistent with the fact that within less than thirty days after the date of the exchange 2,350 shares of the same issue—all that was offered for sale to any one—were sold at par for cash.

The value of property at a given time depends upon the relative intensity of the social desire for it at that time, expressed in the money it would bring in the market. That value depends largely on expectations as to what may be realized from the property in the future. Ithaca Trust Co. v. United States, 279 U. S. 151, 49 S. Ct. 291, 73 L. Ed. 647. The fact that those expectations are highly speculative may not keep them from being influential in bringing about a willingness to expend money for the acquisition of the property or an interest in it. Though a venture is as speculative as a lottery, a chance or interest in it may be readily saleable for a substantial sum of money. The law does not forbid the recognition of the proved exchangeable value of an asset because of the speculative nature of it. Collin v. Commissioner of Internal Revenue (C. C. A.) 32 F.(2d) 753. Furthermore, it did not appear from the evidence that it was mere guesswork to attribute a substantial money value to the shares of stock in question at the time they were received in exchange for an oil and gas lease. At and prior to the date of that exchange, there were extensive explorations and oil developments of nearby lands located on all sides of the tracts covered by the leases held by the corporation. Under the conditions shown by the evidence to have existed at the time those shares were acquired by the tax-

payer, it was not to be assumed that those operations had not resulted in the acquisition of knowledge of facts furnishing a substantial basis for a reasonable belief that oil in paying quantity would be found in land included in those leases. The shares of stock in question represented an interest in assets which included money, oil and gas leases covering more than 1,500 acres of land, an uncompleted well located on part of that land, and equipment used in drilling it. Evidence showed that the right to whatever oil and gas the land covered by those leases might contain was so desired by many persons at or about the time of the mentioned exchange that substantial sums of money were obtainable for oil and gas leases covering that land. Evidence tending to prove that at the time the shares in question were acquired the assets an interest in which those shares represented had, if offered to the public for sale, a presently realizable substantial money value, properly was subject to be considered in determining whether those shares then had a fair market value, and what that market value was. Lamprecht v. Swiss Oil Corporation (C. C. A.) 32 F.(2d) 646, 652; North American Telegraph Co. v. Northern Pacific Ry. Co. (C. C. A.) 254 F. 417; Holmes Federal Taxes (1923 Ed.), 511. The Board's conclusion that those shares, at the time they were received in exchange for an oil and gas lease, had no fair market value, involved a disregard of evidence having a substantial tendency to prove that at that time they had a fair market value.

The finding of the Commissioner on the question of value is prima facie correct. The burden was upon the respondent to produce evidence sufficient to overcome this presumption and to show the correct value upon which the tax was to be assessed, or that the subject of the tax had no fair market value at the time it was acquired by the taxpayer. Williams v. Commissioner of Internal Revenue (C. C. A.) 45 F.(2d) 61.

It appears from the record that the Board of Tax Appeals, in reaching the conclusion that the shares of stock in question had no fair market value when they were acquired by the deceased taxpayer, was influenced by views or considerations inconsistent with rules of law applicable to questions presented for decision.

Because of the above-indicated errors, the decision of the Board of Tax Appeals is reversed, and the cause is remanded for further proceedings not inconsistent with this opinion.