## FOSTER v. COMMISSIONER OF INTERNAL REVENUE.

### No. 6182.

Circuit Court of Appeals, Fifth Circuit.
March 31, 1932.

SIBLEY, Circuit Judge, dissenting.

T. E. Humphrey, of Huntsville, Tex., and M. P. Wormhoudt, of Washington, D. C., for petitioner.

G. A. Youngquist, Asst. Atty. Gen., Sewall Key and Wm. Cutler Thompson, Sp. Assts. to the Atty. Gen., and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and Allin H. Pierce, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., for respondent.

Before BRYAN, SIBLEY, and HUTCHESON, Circuit Judges.

HUTCHESON, Circuit Judge.

This cause is here upon the petition of Mrs. Florence A., Foster, now represented by her executors, for a review of an order of the Board of Tax Appeals determining deficiencies against her in respect of her income taxes for the years 1920 and 1921. What is in question is the value when she acquired it of growing timber which her husband had in 1911 contracted to sell as cut, and which passed to her in October, 1913, under his will, for the purpose of determining the extent of her loss in 1921 from the destruction of timber by storm, and whether payments made to her for timber cut in 1920 and 1921 represented a gain. The facts, shortly stated, are:

In 1911 Mr. Foster, a sawmill and timber owner, in ill health, and desiring to retire from the sawmill business, effected a deal by which he sold his sawmill plant outright, and made a timber contract to sell as cut the merchantable pine timber upon his holdings in certain counties in Texas. The contract fixed a price of $5 per thousand feet log scale for most of it and $4.50 per thousand for that on a designated small tract. It gave the purchaser not to exceed twenty years to cut, but did not undertake to specify the quantity sold. Fixing a minimum cut of 16,000,000 feet each year for the first five years, and 18,000,000 feet thereafter, it provided for payment for the timber monthly as cut, sixty days' default in payment to forfeit, at Foster's election, all the rights of the purchasers in the contract. All the taxes paid by Foster, where he owned only the timber, would be returned to him from year to year; where he owned land and timber, 80 per cent. of them would be returned. The contract, in effect an option contract to buy and pay for the timber as and when cut at a fixed price, passed no title to the purchasers to any timber, except that cut and removed, and only when and as it was cut and removed. All loss of timber or damage to it until removed was Foster's, as of course was the benefit of its growth. The contract did not fix, nor is there any evidence affording any basis for determining, the actual amount of merchantable timber ten inches and up that there was on the land at the time the contract was made, nor is there any basis in the contract or the evidence for determining the rate of growth of the standing timber and how much the amount covered by the contract would be increased, during the time it had to run, by growth. During the year 1921, 2,225,000 feet of timber of bet-

ter than average quality was destroyed by storm. In 1920 and 1921 petitioner received for timber cut in those years the contract price $5 and $4.50 per thousand feet.

Petitioner, believing that the timber lost was worth $5 per thousand, and the timber sold $5 and $4.50 per thousand in October, 1913, when acquired by her, in her income tax returns for those years claimed a loss of $5 per thousand for the timber destroyed, and returned no gains on account of timber sold. The Commissioner, conceiving that Mrs. Foster acquired by the will, not the timber, but merely the right under the timber contract to receive $5 and $4.50 per thousand for the timber as and when cut, valued this right as to the timber lost and that cut and paid for in 1920 and 1921 at $3.50 per thousand in 1913, a figure arrived at by roughly discounting for the time it had run without interest, the fixed contract price of $5 and $4.50, and determined deficiencies accordingly.

[1] The Board rejected the view that Mrs. Foster had inherited a contract right and not the timber. It held correctly that a time contract to cut and remove timber passed no title whatever save to the timber removed within the time limited, Martin v. So. Pine Lbr. Co. (Tex. Com. App.) 284 S. W. 919; Houston Oil Co. v. Boykin, 109 Tex. 276, 206 S. W. 815; Carter v. Clark (Tex. Civ. App.) 149 S. W. 278; Texas Creosoting Co. v. Hartburg Lbr. Co. (Tex. Civ. App.) 298 S. W. 645; Temple Lbr. Co. v. Arnold (Tex. Civ. App.) 14 S.W.(2d) 929, and that Foster's title to the timber remained in him, and at his death passed by his will to her. It, however, without assigning any reason, by methods of its own not disclosed in its opinion, valued the timber at $3.50 just as the Commissioner had done. The sole question here is whether the Board's finding of value, for which it gave no reason, is, as petitioner contends, arbitrary, and without support in the evidence, or as respondent claims, finds support there.

The only testimony as to the value of the timber was that of Womack and Milikien, Foster's agents before and Mrs. Foster's after his death, to look after and handle the timber, that it was well worth $5 per thousand in 1913, and $8 in 1921. Both of these witnesses had known the timber for many years through their association and employment with Foster during his lifetime and Mrs. Foster since, to handle their timber matters for them. Both were fully competent to testify to values, and no one contradicted them. Neither had any interest in the outcome. The only other evidence tending to bear on the question of value was the contract itself, which fixed the price in 1911 for the timber in question at $5 and $4.50, the proof that as cut in and since 1911 it had brought that price, and an inventory filed in Kansas City, Mo., in 1913 by Mrs. Foster and Benjamin B. Foster, Thomas Foster's executors. This inventory estimated the timber at 300,000,000 feet, and to "offset the carrying charge" valued it at $3.50 per thousand.[1]

The record shows that the figure for quantity which the executors used was as arbitrary as the figure used for value. It establishes that the timber, when it was sold in 1911, had a market value of $5 per thousand feet, that for other timber similarly situated, except adjacent to a different mill, the same owner at that time had refused $5 a thousand, and that the timber in question here was sold as it was only because Foster had made a fine sale of the sawmill plant to which the timber sold lay adjacent.

Womack further testified that in 1913, after Foster's death, he made up a statement for the executors showing a value for the timber of $4.50 for 45,000,000 feet and $5 for 255,000,000 feet. He further testified that, after the contract was made in 1911 for bookkeeping purposes, he roundly estimated the value of the timber at a million dollars, and that the figure of 300,000,000 feet at $3.50 per thousand was a mere arbitrary bookkeeping entry.

The contract aside, we think it could not for a moment be contended that the evidence establishes for the timber in question a value in 1913 of $3.50, for there is not only opinion evidence uncontradicted that the timber was worth $5 and $4.50 then, but it is also uncontradicted that $5 was refused for similar timber, and that for all cut in 1911, 1912, and 1913 $5 was paid. The timber contract aside, no one would contend that property owned outright and valued at $5 in 1913, carried until 1921, and then sold at $5, could be figured on the discount method as worth $3.50 or in fact any other sum than $5, in either 1913 or in 1921. Does the fact that, though the timber was in 1913

[1] A note attached to the inventory explains the $3.50 per thousand value as follows: "While the timber is figured at $3.50 per thousand, this stumpage is sold under contract and it is to be paid for monthly as sawn at the rate of $5 per thousand feet without interest; the difference of $1.50 is considered an offset for the carrying charge. Contract provides that a minimum of 18,000,000 feet per annum shall be cut."

worth $5 per thousand, there was an option against it requiring the owner, if the purchasers proceeded in accordance with the contract minimum, to carry it until 1921, to receive then $5 without interest, authorize its valuation in 1913 for income tax purposes, at $3.50, roughly $5, discounted for the time? The Commissioner thought and said so; the Board did not say so, but it must, we think, have given some effect to the deferred payment feature of the contract, for the evidence affords no other basis for their finding of $3.50. The oral testimony fixes $5 as the value; the contract fixes $5, the inventory fixed $5, then discounted it for the time to run.

· We do not think the existence of the contract affects the valuation at all. We find no warrant in the statutes or the regulations governing the fixing of values for income tax purposes for this time discounting theory. They fix as the basis for determining loss or gain "the fair market price or value of the property at the time of its acquisition." We think there is no more warrant for fixing the value in 1913 for income tax purposes at $3.50 by discounting forwards and thus establishing a gain in 1921 than there would be for fixing the amount received in 1921 at $3.50 by discounting backwards; that is, allowing the taxpayer a credit on the $5 value existing in 1913 for carrying charges, and thus establishing a loss. The question for decision here is not the value of the payments which Mrs. Foster might or might not, according to whether and how it was performed, receive at one time or another under the option contract. It is not whether she may have the benefit of the carrying charge to show a loss, nor whether, as here claimed, it may be used against her to depress the value of the base. The question simply is, What was the value in 1913 of the timber which she lost, and of that which she sold in 1920 and 1921? and we think the answer to it as simple, is that it was $5 per thousand. ·

▋ Bound as we are to indulge in favor of findings of the Board upon fact questions, such as value, every reasonable ·intendment, obligated as we are not to upset them when they are sustained by the evidence (Phillips v. Comm., 283 U. S. 600, 51 S. Ct. 608, 75 L. Ed. 1289), we are not bound by a value the basis of which is arbitrarily ·or theoretically set down. The Board may not create; it must find in the evidence the value which it fixes. Nichols v. Comm. (C. C. A.) 44 F.(2d) 157; Bonwit Teller & Co. v.

Comm. (C. C. A.) 53 F.(2d) 381; Boggs v. Comm. (C. C. A.) 34 F.(2d) 859. It may not make a theory take the place of fact. Comm. v. Swenson (C. C. A.) 56 F.(2d) 544.

The decision of the Board of Tax Appeals is reversed, and the cause remanded for further proceedings not inconsistent with this opinion.

SIBLEY, Circuit Judge (dissenting).

.What Mrs. Foster got by her husband's will in October, 1913, was not timber on the market and worth the market price, but timber off the market and already sold for $5 per thousand feet, deliverable in the future, and to be paid for as delivered, without interest. The contract of sale is not in the record, but the excerpts from it make it out a binding contract of sale, with no option feature, except that, if the purchaser fails to pay as agreed, the seller has an option to end the contract without liability on the buyer for breach beyond paying for what had been already cut. The entire lot of timber was tied into one whole by Mr. Foster's contract. Under it a situation existed very much like that where the coal in an exhaustible mine or oil in an exhaustible oil pool has been similarly sold. The fair unit value of the seller's exhaustible property after making the contract will not depend on the market value from time to time of the thing sold, for it is no longer on the market. One buying from Mrs. Foster in October, 1913, her timber rights as fixed by the contract would consider the market price of timber only in connection with the possibility of the contract becoming forfeited, and would be governed more directly by the sale price and the probable average time he would be out of his money. Against interest, loss of timber and taxes on the timber not reimbursed, he would figure the gain by the growth of the timber. If the latter would offset the former, the reasonable value per thousand feet of the timber would equal the sale price. If not, a reduction in value would be made to take care of the difference. Therefore, in fixing the fair market value in 1913 of this timber, the probable time that the contract then had to run, the average cost of carrying the timber, the offsetting growth, and the sale price would be the most important elements to consider. Mrs. Foster and her coexecutor in an inventory made at the very date in question valued this timber thus. circumstanced at $3.50 per thousand. As plainly appears by their then explanation found

in the footnote to the majority opinion, the valuation was not a guess, but arrived at by a consideration of the elements above pointed out as proper to be considered. To cut 300,000,000 feet at a rate of 18,000,000 per year, probably the known capacity of the sawmill, would require 16⅔ years, and would fix an average loss of interest for 8⅓ years. The length of time and amount involved are so great as to render it probable that compound rather than simple interest would be figured by an investor. An investment of $3.50, with compound interest at 6 per cent. for 8⅓ years, would amount to $5.67. At 8 per cent., a legal rate in Texas, it would be much more. The $5 per thousand to be received would leave a loss in interest in addition to loss of timber and taxes. The growth of the timber must have been considered to offset these losses in order to fix a then average value so high as $3.50. Mrs. Foster's interests as executrix and as devisee were the same. A statement made by her as executrix is evidence against her individually. Waterman v. Moody, 92 Vt. 218, 103 A. 325; Dowling v. Feeley, 72 Ga. 559. Beginning in 1913, Mrs. Foster continuously carried her investment on her books at $3.50 per thousand. These are weighty admissions by her directly on the point at issue. The Board had a right to reject the explanation that $3.50 was an arbitrary figure. If the appraisal by Mrs. Foster had been one for estate taxes, it would have been final evidence of the value of what she received. Regulation 45, art. 1562; Regulation 62, art. 1563. It is sufficient evidence, and I think near the truth. Value as a fact is a matter to be determined by the Board. Avery v. Commissioner (C. C. A.) 22 F.(2d) 6, 55 A. L. R. 1277; Anchor Co. v. Commissioner (C. C. A.) 42 F.(2d) 99; Am-Plus Storage Battery Co. v. Commissioner (C. C. A.) 35 F.(2d) 167.