### CHAMPLIN v. COMMISSIONER OF INTERNAL REVENUE.

### No. 935.

Circuit Court of Appeals, Tenth Circuit.

April 11, 1934.

24

Harry O. Glasser, of Enid, Okl., for petitioner.

John G. Remey, Sp. Asst. to Atty. Gen. (Sewall Key, Sp. Asst. to Atty. Gen., on the brief), for respondent.

Before PHILLIPS, McDERMOTT, and BRATTON, Circuit Judges.

McDERMOTT, Circuit Judge.

This petition to review a decision of the Board of Tax Appeals brings forward two distinct questions which will be treated separately.

I.

Mrs. A. D. N. Champlin made a separate return for the years 1919 and 1920, in which she returned as her own income profits from an oil lease and refinery operated under the trade name of the Champlin Refining Company. She paid a tax for 1919 of $98,423.79 and for 1920 of $27,821.18. Finding that these profits were those of her husband, H. H. Champlin, the Commissioner added them to his return, and assessed a deficiency on his tax for those years. The Commissioner tendered a refund to Mrs. Champlin of the 1920 tax of $27,821.18, which she declined, but neglected to tender a return of the 1919 tax of $98,423.79. Asserting that the profits taxed by the deficiency assessment were not his profits, Champlin petitioned the Board of Tax Appeals to redetermine the deficiency. The Board denied the petition.

The facts are not disputed. Champlin was a banker and business man in Enid, Oklahoma. Mrs. Champlin had independent means from her parents. The Garfield Oil Company owned a block of acreage near Enid and was drilling a test well. One of the leases in the block was the Beggs Lease, which provided that if no well was completed thereon by August 23, 1916, it should terminate unless a rental of $80 was paid. At the end of the lease, a provision was added obligating the lessor to commence a well somewhere in the block by August 23, 1916. This was done, but the lessor did not tender the rentals until August 26. On the 25th the test well came in. Beggs refused the tender, and Champlin obtained a top-lease from him, pay-

ing a cash bonus of $12,000 therefor. Of this sum, Champlin borrowed $10,000, his wife signing the note. Then ensued eight years of litigation in the state courts, with two appeals to the Supreme Court of Oklahoma,[1] over the ownership of the lease, eventually resulting in confirming Champlin's title. During the litigation, the lease was developed, oil and gas of the value of $1,734,-000 being taken therefrom prior to incorporation on April 17, 1920. A small refinery was acquired, pipe lines laid, tank cars and other equipment purchased.

While Champlin was drilling the first well on the Beggs Lease, he told his wife that the cost of the lease and the well would be about $25,000, and he stood to lose it all if the well came in dry. Whereupon, as Mrs. Champlin testified,

"Petitioner told her upon that occasion that if he did not strike oil his investment would be a total loss; that the witness thought she would like to invest in it and suggested that she wanted it carried on; that she did not wish to hamper petitioner's business in any way, had this money, and was anxious to have it used in the lease; that she told him if he lost what he had put into the lease she would lose what she had put in; and the witness testified, 'If we lost, we lost; and if we won, we won.' That there was nothing said as to the witness being liable for other debts that might have accumulated; and there was never any written agreement entered into."

Or, as Mr. Champlin testified:

"That at the time the first well was being drilled, or immediately prior thereto perhaps in the month of November, the petitioner and A. D. N. Champlin, his wife, were coming in from the lease and the petitioner advised his wife that the cost of the lease and the drilling of the first well would be about $25,000.00; and that petitioner stood to lose $25,000.00 before he knew whether he would have a producing oil well or a dry hole; and Mrs. Champlin then proposed that she put in her money received from her father and mother, which she did from time to time.

"That in contributing her money, Mrs. Champlin said she was willing to lose and petitioner accepted her proposition, and from that time on she began to put in her money.

"It was not anticipated or agreed that Mrs. Champiln should stand losses beyond the amount she had contributed; that she had this money and she was willing to lose it.

"That with reference to the first conversation upon the original investment, it was understood that Mrs. Champlin was to share in the profits or losses, whatever they would be; that the petitioner and his wife did not write anything down, they had a sort of mutual confidence and still have; do not deal with each other as outside parties, and did not write anything down."

Their testimony also is that Mrs. Champlin was not to be known in the operation of the business.

That Mrs. Champlin did in fact invest $13,495.33 of her own separate funds in the enterprise—approximately the same amount as her husband—is proven by canceled checks and not disputed. Nor is it disputed that she, with her husband, obligated her own personal estate for all moneys borrowed in the enterprise. It is significant that Mrs. Champlin made no contribution to nor investment in Champlin's other business adventures—among them a bank and a hardware store—nor did he borrow any money from her in connection therewith.

No profits, except a stock distribution on incorporation, have ever been drawn from the business by either. Champlin had an account with the company, to which were charged such withdrawals as he made, and credited such advances. Which way that balance stands is not disclosed.

The title to the lease remained in Champlin's name. The business was conducted in his name until 1917, when the trade name of Champlin Refining Company was adopted. Mrs. Champlin never drew on the concern's bank account and had no written authority so to do, although Champlin testified her checks would have been honored. Champlin twice, in legal proceedings, signed statements that he was the sole owner of the business.

Upon incorporation in 1920, the stock was divided approximately equally between Mr. and Mrs. Champlin. She has retained that stock, and it is her separate property.

Partnership returns were filed for the years in question; none was filed in 1918, but none was required until section 224, Revenue Act of 1918, 40 Stat. ch. 18, § 1409, became effective on February 25, 1919. That joint returns were made for 1917 and 1918 is of no significance.

---

[1] Garfield Oil Co. v. Champlin, 78 Okl. 91, 189 P. 514; Garfield Oil Co. v. Champlin, 103 Okl. 209, 229 P. 824.

Upon this evidence the Board found the following facts:

"Shortly after August, 1916, petitioner began development of the property. He found that the cost of the lease and the drilling of the first well would require about $25,-000. In October he mentioned to his wife that the venture was new for him, that he expected to put in so much and no more, and that if the well were dry, the whole investment would be a loss. His wife proposed that she put in money of her own which she had received as gifts from her parents, and that if he lost what he put in, she would lose what she put in. Nothing was said about her sharing in the profits or losses in excess of the amount that she contributed. On December 21, 1916, her contributions totaled $13,-495.33. None of this amount has been repaid to her, nor has she received any distribution of the profits or assets of the business. During the first six or eight months petitioner borrowed additional funds for development upon notes signed by himself and wife."

In its opinion, it concluded that this record, carefully scrutinized, failed to establish a partnership. The Board said:

"The wife merely contributed some of her own funds to the petitioner to be used in the acquisition and operation of the lease, being at the same time aware that the venture might prove unsuccessful and that her contribution might thus be lost. Nothing more was understood as to a partnership relation, either between themselves or by anyone else who did business with the petitioner. The wife had no authority to participate either in the management or the responsibilities of the business, and she never attempted to exercise any. The business was conducted entirely by the petitioner and in his own name. No distribution of profits was ever made to the wife."

■ While a finding of fact of the Board of Tax Appeals will not be disturbed by the courts if there is any substantial support for it in the record, it is the province of the courts to review its decisions of the law. The

Commissioner and the Board properly subjected the testimony of Mr. and Mrs. Champlin to rigid scrutiny, as has this court, for the temptation to escape the higher surtax brackets by an apportionment of income inside the family is a strong one. But the testimony has withstood that scrutiny, and there is no intimation in the record or briefs of any fraud or collusion. The Board found their testimony to be true, for it incorporates it in the finding, except the statement that losses and profits would be shared, which is nevertheless inferred by the negative statement that nothing was said about sharing in excess of the amount contributed. Moreover their testimony is corroborated by the irrefutable facts that Mrs. Champlin did, out of her own estate, contribute half the original capital; she obligated her estate equally with her husband for all moneys borrowed; she owns now, in her own right, subject to her sale or gift without his consent, one-half of the stock of the company. To say no more, she is and has been from 1916, a joint owner of the enterprise.

■ The error in the conclusion of the Board of Tax Appeals, as we conceive it, is this: Having found, as a matter of law, that the testimony did not establish a general trading partnership, the Board concludes that the profits from the enterprise belonged to her husband and not herself. The conclusion does not follow. If she were a tenant-in-common, a joint-adventurer, or a mining partner, the profits would still be hers and not his. A share-cropper is not a general partner; yet the landlord cannot be compelled to pay taxes on the tenant's share of the crop. The petitioner must prevail if the proof conclusively shows these profits were not his, and it is not material whether the relationship is a general partnership, a mining partnership, or a joint-tenancy.[2]

■ We do not stop to inquire closely as to whether a general trading partnership resulted from the undisputed facts, save only to note that a pooling of resources in a common venture, and an agreement to share profits and losses, are the principal indicia of a gen-

---

[2] The petition to review speaks of the relationship as a partnership, which would include a mining partnership, and as one of joint-ownership. The controlling question is whether the profits taxed are those of the petitioner, and not how they are characterized by the Board or the parties. In Wyoming Investment Company v. Commissioner (C. C. A. 10) 70 F.(2d) 191 (filed March 26, 1934), the government contended, and this court held, that courts rule upon the validity of orders, and not the soundness of the reasons given therefor. See Story Parchment Co. v. Paterson Co., 282 U. S. 555, 51 S. Ct. 248, 75 L. Ed. 544; Dickey v. Burnet (C. C. A. 8) 56 F.(2d) 917.

eral partnership;[3] that the management is confided to one of the partners, and that the other does not know his credit is back of partnership obligations, is not decisive. The Board of Tax Appeals and the courts have found that partnerships existed between members of a family on less persuasive evidence than contained in this record. Rose v. Commissioner (C. C. A. 6) 65 F.(2d) 616; Commissioner v. Olds (C. C. A. 6) 60 F.(2d) 252; Barnes v. Commissioner, 7 B. T. A. 924, affirmed (C. C. A. 3) 30 F.(2d) 289; In re Brackman, 24 B. T. A. 259, 262.

We do not go into the question more thoroughly, because it is entirely clear that under the finding of fact of the Board of Tax Appeals, as well as the record, a mining partnership, at least, resulted.

█ The relationship arising is to be determined by the laws of Oklahoma. Burk-Waggoner Ass'n v. Hopkins, 269 U. S. 110, 46 S. Ct. 48, 70 L. Ed. 183.

By statute, in Oklahoma, husbands and wives may enter into such mutual agreements or transactions as either might, if unmarried. O. S. 1931, § 1655.

██ Very recently the Eighth Circuit Court of Appeals and our own court have passed upon the essentials and attributes of a mining partnership in Oklahoma, and have exhaustively reviewed the decisions of the courts of that state. In Sturm v. Ulrich (C. C. A.) 10 F.(2d) 9, 14, which involved an association between a man and his wife, the court, speaking through Judge Stone, held:

"They were to share expenditures and profits, in proportion to their respective interests, from such mining operations. This gave rise, under the above rules of law, to a mining partnership which, although its membership changed, never ceased to exist."

In Dana v. Searight, 47 F.(2d) 38, this court followed the Eighth Circuit, and held that one mining partner was liable for debts contracted by the other. In addition to the Oklahoma cases cited by Judge Lewis and Judge Stone in these opinions, see Ferguson v. Nagle, 159 Okl. 219, 15 P.(2d) 1.

The facts in this case fit well within this test, and well within the decisions of the Oklahoma Supreme Court. Mrs. Champlin contributed to the venture; she was to share in the profits and losses; she now owns stock representing her interest. The Board found that "Nothing was said about her sharing in the profits or losses in excess of the amount that she contributed." What was said was, "If we lost, we lost; and if we won, we won." A broad agreement to share profits and losses is not nullified or limited by a failure to particularize as to a limit thereon, as the cases cited abundantly show. The circumstance that on two occasions, Champlin signed legal documents as the sole owner of the properties, is of little weight, when it is recalled that the title stood in his name, and that the

---

[3] Section 11624, Okl. Stat. 1931, provides:

"Partnership is the association of two or more persons for the purpose of carrying on business together, and dividing its profits between them."

Section 11629, Okl. Stat. 1931, provides: "An agreement to divide the profits of a business implies an agreement for a corresponding division of its losses, unless it is otherwise expressly stipulated." Higgenbotham v. Stanley, 36 Okl. 302, 128 P. 238; Foster v. Wilkinson, 96 Okl. 110, 220 P. 325.

The Oklahoma courts, while holding that a sharing of profits and losses is the principal criterion, hold there must be an intention to become partners, and a community of interest. Citizens' Bank v. Mitchell, 24 Okl. 488, 103 P. 720, 20 Ann. Cas. 371; Cobb v. Martin, 32 Okl. 588, 123 P. 422; Farmers' Co-op. Elevator v. Farmers Union Co-op. Exch., 127 Okl. 275, 260 P. 755, 757; Municipal Paving Co. v. Herring, 50 Okl. 470, 150 P. 1067, 1068; Gorman v. Carlock, 72 Okl. 104, 179 P. 38, 39; Morris v. Savage, 126 Okl. 221, 259 P. 239; Criner v. Davenport-Bethel Co., 144 Okl. 74, 289 P. 742.

Generally on the subject, see Mechan v. Valentine, 145 U. S. 611, 12 S. Ct. 972, 36 L. Ed. 835; Paul v. Cullum, 132 U. S. 539, 10 S. Ct. 151, 33 L. Ed. 430; In re John T. Newell, 17 B. T. A. 93; In re R. C. McKnight, 13 B. T. A. 885; In re Leonard M. Gunderson, 23 B. T. A. 45; 3 Kent Comm. 23; Note, Miller v. Simpson, 18 L. R. A. (N. S.) 963.

It is frequently said that no one test of a partnership can be laid down. It cannot, for it depends upon who is asserting or denying the claim. If a third party is seeking to hold one as a partner, the element of estoppel enters in. Between the parties, the question is one of mutual assent, as in the case of any other contract. If there is an express and unambiguous agreement, its terms govern; if not, then assent is gathered from what the parties did or said; a community of interest and a sharing of profits and losses is persuasive evidence of a partnership, in the absence of countervailing proof.

documents dealt with the legal title. He was the sole owner of the legal title.

 Even if all that has been heretofore said is wrong, there would still be a joint ownership of the properties from which these profits came, quite sufficient to substantiate her right thereto. There is nothing in the record to support a claim that a debtor and creditor relation existed between husband and wife; every syllable of evidence and the finding of the Board is to the contrary. Nor is there anything to justify the suggestion that Mrs. Champlin was to lose if the wells were dry, but not to profit if they were producers. Such an arrangement ought not to be imputed if a more reasonable construction may be put upon their acts. In a series of cases, the Eighth and other circuits have steadfastly held to the rule clearly stated by Judge Walter H. Sanborn, that where an agreement is fairly susceptible of two constructions, that one will be preferred which is rational and probable, and such as prudent men would naturally execute. Pressed Steel Car Co. v. Eastern Ry. Co. of Minnesota (C. C. A. 8) 121 F. 609; Choctaw, O. & G. R. Co. v. Bond (C. C. A. 8) 160 F. 403; A. Leschen & Sons Rope Co. v. Mayflower G. M. & R. Co. (C. C. A. 8) 173 F. 855, 35 L. R. A. (N. S.) 1; Bayne v. United States (C. C. A. 8) 195 F. 236; Barnsdall Oil Co. v. Leahy (C. C. A. 8) 195 F. 731; Star-Chronicle Pub. Co. v. New York Evening Post (C. C. A. 2) 256 F. 435; Richardson v. Western Oil, Coal & Investment Co. (C. C. A. 8) 3 F.(2d) 403; W. J. Foye Lumber Co. v. Pennsylvania R. Co. (C. C. A. 8) 10 F.(2d) 437; P. W. Brooks & Co. v. North Carolina Public Service Co. (C. C. A. 4) 37 F.(2d) 220, certiorari denied 281 U. S. 741, 50 S. Ct. 347, 74 L. Ed. 1154.

 There is nothing in Burnet v. Leininger, 285 U. S. 136, 52 S. Ct. 345, 76 L. Ed. 665, to the contrary. It was there held that a man could not take his wife into a partnership without consent of the other partners. That rule is not applicable to mining partnerships, and here there was no other partner to be consulted.

 The Commissioner was without authority to assess Mr. Champlin on profits that belonged to his wife. We conclude that the Commissioner erred on this branch of the case.

## II.

The properties were incorporated on April 17, 1920, and 2,700 shares of a par value of $1,000 each were issued. Of these, 1,351 shares were issued to H. H. Champlin, 1,345 to Mrs. Champlin, the remaining 4 to qualifying officers. None of the stock has been sold, nor offered for sale, nor have there been any offers to buy.

The balance sheet of the corporation as of the date of incorporation discloses

| | |
|---|---|
| Current Assets | $ 753,407.73 |
| Fixed Assets, refinery, tank cars, equipment, etc. | 828,632.24 |
| Real Estate | 11,446.50 |
| Beggs Lease | 1,147,500.00 |
| Total of Assets | $2,740,986.47 |
| Current Liabilities | $ 99,937.85 |

This balance sheet does not reflect the contingent liability which existed by reason of the litigation over the Beggs lease. If it had been adjudicated that the Beggs lease was owned by the Garfield Oil Company, the Champlin Refining Company would have been required to account for oil and gas taken from the premises of the value of $1,734,000.

 Section 202 (b) of the Revenue Act of 1918 (40 Stat. 1057, 1060) provides:

"When property is exchanged for other property, the property received in exchange shall for the purpose of determining gain or loss be treated as the equivalent of cash to the amount of its fair market value, if any."

The Commissioner, impliedly at least, determined that the stock received by Champlin and his wife in exchange for the properties had a fair market value; in arriving at that fair market value, he ascertained the value of the Beggs lease and diminished it 25 per cent. on account of the pendency of the litigation over the title. He assessed a tax on a gain of $869,108.05, the difference between this value and the cost of the lease and equipment. In so computing the gain, the Commissioner overlooked the undisputed fact that nearly one-half the stock was issued to Mrs. Champlin, and is still owned by her. Although there is no finding of fraud or collusion, the assessment is made upon the assumption that Mr. Champlin owns the stock issued to Mrs. Champlin.

Champlin petitioned the Board of Tax Appeals to redetermine the assessment, contending, first, that there was no fair market value for this stock, and, second, that if there was, the Commissioner overlooked the liability, not shown on the books, which would ex-

ist if the litigation over the title to the Beggs lease were unsuccessful.

There is no difficulty about the law governing such transactions. The Sixteenth Amendment authorizes Congress to lay a tax on income. In Eisner v. Macomber, 252 U. S. 189, 40 S. Ct. 189, 64 L. Ed. 521, 9 A. L. R. 1570, the court defined income to include a gain or profit arising where something of exchangeable value, severed from the capital, is received by the taxpayer for his separate use, benefit, or disposal. Accordingly, Congress made no attempt to lay a tax upon a transaction where property was exchanged for stock unless the stock received had a market value; that is, there must be a market where its exchangeable value could be realized. More than that, the stock must have a "fair" market value; that is, there must be a market where it may be exchanged for cash at somewhere fairly close to its actual value. That Congress did not intend to lay a tax upon a transaction where property was exchanged for stock for which there was no fair market value, is emphasized by its use of the words "if any."

■ There may be a fair market for stock, even though the owners do not care to sell. If that is true, a taxable gain arises, even though the owners of the stock do not avail themselves of that market. In such cases, the Commissioner is authorized to resort to the intrinsic value of the stock for the purpose of determining its fair market value. Heiner v. Crosby (C. C. A. 3) 24 F.(2d) 191; Wright v. Commissioner (C. C. A. 4) 50 F. (2d) 727; Commissioner v. Swenson (C. C. A. 5) 56 F.(2d) 544, certiorari denied 287 U. S. 618, 53 S. Ct. 19, 77 L. Ed. 537; Crowell v. Commissioner (C. C. A. 6) 62 F.(2d) 51.

This construction of the statute has been uniformly sustained by the courts. In O'Meara v. Commissioner (C. C. A. 10) 34 F.(2d) 390, this court was confronted with a situation where producing oil properties, including drilling rigs, casing, and other personal property which had a market value, the title to which was not in dispute, were transferred to a corporation in exchange for stock. The evidence in that case as to the lack of a fair market was not as convincing as the evidence in this case. It was there held that no taxable gain resulted from the transaction. The opinion of Judge Phillips makes it unnecessary to extend the discussion here. It may be noted, however, that this court held that stock which must be sacrificed in order to convert it into cash, does not have an exchangeable value within the meaning of the statute.

This decision was followed in Schoenheit v. Lucas (C. C. A. 4) 44 F.(2d) 476, 480, where real estate of a conceded market value was exchanged for stock in a corporation. It was held that no taxable gain resulted because there was no market upon which the stock could be sold "for an amount reasonably approximate to its intrinsic value."

The O'Meara Case was also followed by the Second Circuit in Mount v. Commissioner, 48 F.(2d) 550, where property was exchanged for stock of a corporation, that court holding that since it appeared that there was no fair market for the stock, recourse could not be had to its intrinsic value.

■ It is stipulated in the case at bar that there were no offers to buy or sell this stock at any time in controversy. This in itself, is strong proof that there was no market.

The testimony upon the question is as follows:

E. W. Marland, a large operator in this field at that time, testified that there was no market anywhere for this stock; that in order to sell it, the stockholders would have had to have found some one with no knowledge of the ethics of the oil business, and with no knowledge of the value of the properties, and one who would have faith in the ultimate decision of the Oklahoma courts on the question of title. He testified that ethical oil men will not acquire a top-lease, that is, a lease made with a prior unreleased lease of record, at any price. That the stock had little or no actual value, not much above the junk value of the equipment.

Mr. Eason, President of the Eason Oil Company, testified that there was no market for such stock, and that it could only have been sold at a great sacrifice, if it could have been sold at all. That no person would have bought it unless the title to the property had been guaranteed by a bond.

Mr. Moody, the Vice President of the Mid-Continent Petroleum Corporation, a large operator in this field and a competitor of Champlin's, testified that the stock had no market value before the final decision of the Supreme Court on the title, and that it could not have been sold for an amount reasonably approaching its intrinsic worth; that it could not have been converted into cash without "a terrific sacrifice in its value" on account of the title.

Mr. Chandler, general counsel of the Garfield Oil Company which asserted title to the Beggs lease, and a dealer in oil stocks, testified that this stock had no market value except what his client would have paid for it in settlement of the litigation; that his client would not have paid in excess of $50,000 or $75,000 to compromise the claim of Champlin's; that at the time of the incorporation, and in the light of the first decision of the Supreme Court which had then been handed down, no one would have paid a substantial amount for the stock.

Mr. Brinley, a member of the New York Curb and Stock Exchange, testified that the Champlin stock would have had no market value, and could not have been sold for an amount reasonably approximating its value, but only at a tremendous sacrifice; that the allowance for the hazard of litigation should have been 75 per cent instead of 25 per cent; that it could not have been received for listing on the Stock Exchange with the litigation pending. That in order to market a security there must be a clear title, and the absence of such clear title would preclude any broker from underwriting the stock.

This is all of the evidence on the subject. It cannot be disregarded. The witnesses are men of high standing, and their testimony inherently probable. It is a matter of common knowledge that there is no fair market for a lawsuit, the outcome of which is as precarious as the one here. It also appears, without dispute, that the greater part of the market for this stock is eliminated by the ethics of the oil business. We therefore conclude that there is no support for the finding of the Board of Tax Appeals that there was a fair market value for this stock.

The theory of the Board of Tax Appeals appears to have been that the litigation only clouded the title to the Beggs lease, and that the title to the refinery, tank cars, and equipment was not in dispute; that since there was a market for tank cars and casing and equipment, there was a market for this stock. There are several objections, as we see it, to this line of reasoning. In the first place, the Beggs lease was considered in making the assessment. Again, the refinery, tank cars, and equipment were operated in conjunction with the lease, and without the oil from the lease, the value of the other assets was seriously impaired. Still further, the record discloses that if the title to the Beggs lease failed, Champlin must account to the owner of the lease for oil and gas taken from the premises of the value of $1,734,000. That liability is quite large enough to wipe out all the value of the other assets. The truth about the matter is that if Champlin lost the lawsuit, this stock was worthless.

But all this, as we see it, is beside the point. Before the Commissioner is authorized to value the assets of a corporation for the purpose of arriving at the value of its stock, he must first determine that there is a fair market value for the stock. The evidence conclusively shows, without contradiction, that this stock had no fair market value. That being true, there is no justification for an effort to ascertain the intrinsic value of the stock.

We conclude that no taxable gain resulted when Mr. and Mrs. Champlin transferred these properties to the Champlin Refining Company and accepted stock in exchange therefor.

The decision of the Board of Tax Appeals is therefore

Reversed.