## COMMISSIONER OF INTERNAL REVENUE v. NEWBURY.
### No. 5466.

Circuit Court of Appeals, Seventh Circuit. Dec. 18, 1935.

Milford S. Zimmerman, of Washington, D. C., Frank J. Wideman, Asst. Atty. Gen., and Sewall Key and Helen R. Carloss, Sp. Assts. to the Atty. Gen., for petitioner.

Joseph R. Little and Laurence Graves, both of Washington, D. C., for respondent.

Before SPARKS and ALSCHULER, Circuit Judges, and LINDLEY, District Judge.

SPARKS, Circuit Judge.

This petition for review filed by the Commissioner presents the question of whether or not the Board of Tax Appeals erred in denying that there was a deficiency in respondent's income tax for the year 1923, and that a penalty should be assessed thereon. The Board's decision was based on the ground that certain stock in a new corporation, exchanged together with $3,655,518 cash for the stock of an old corporation, had no readily realizable market value at the time of the exchange, hence no taxable gain resulted from the transaction.

The taxpayer, Mrs. Newbury, is the trustee of a series of trusts created in 1904 by the will of her husband for the benefit of herself and their four children. At the time of his death, his estate consisted principally of 4,999 of the 5,000 shares of stock of an Illinois corporation known as the Boston Store, organized by him in the preceding year to take over the business of that store which had been founded by him in 1873, and the real estate upon which the business was located. This real estate was either owned by him in fee, or held by him under contracts of purchase or long term leases.

Under the terms of the will, after certain specific legacies and devises, the entire estate was left in trust to respondent, with the provision that she was to hold this entire estate as the principal trust estate, paying one-third of the income to herself. With the remaining two-thirds, she was to create four separate trust funds for the benefit of their four children. These funds were to be used for the support and education of their respective beneficiaries, and each beneficiary, when he reached the age of twenty-five years, was to receive the income from his fund, and in the discretion of the trustee, the sum of $25,000 to be paid from the fund, and upon their attaining the age of thirty years, each was to receive the sum of $100,000, if the trustee saw fit. In the event that the separate trust funds were inadequate to meet these principal payments, they could be paid out of the principal of the principal trust estate, unless that required selling the real estate upon which the business was conducted. The will gave respondent as trustee complete control over the trust estate, with authority to buy, sell, invest and reinvest. The only exception was as to the real estate on which the business was located, which the testator hoped she would hold together for the benefit of the entire estate.

When respondent, upon the death of her husband, entered upon the management of the principal trust estate, the buildings occupied by the corporation were old and unsatisfactory for the corporate purposes. She therefore determined to erect a new building on the land held by the principal trust in fee or under lease. She also completed the purchase of those parcels which her husband had contracted to buy. Within a year or two after her husband's death, she began the erection of a new seventeen story building which was put up in eight sections, the last of which was not completed until 1915. During these building operations the corporation occupied the premises as a tenant at will. In 1916 leases were executed by Mrs. Newbury, individually, for a parcel of land held by her, and as trustee for the rest of the land held by the principal trust estate. The leases were to run for a period of twenty-five years. They provided for a graduated scale of rentals and the payment by the lessee of all taxes and special assessments. The evidence showed that in the year 1923 payments due and paid under the leases amounted to $1,334,404.50.

The construction of the building was financed in part by a bond issue and by loans from an insurance company. In addition to these two sources, Mrs. Newbury used money belonging to herself, individually, and borrowed from herself, as trustee of the separate trusts, money accumulated from the income of the principal trust which, under the terms of the will, she was obligated to pay over to the separate trusts. These trusts had been set up on her accounts, and duly credited with the respective shares of the income of the principal trust as they accumulated, but she had never actually segregated the funds for any of them. The result was that in 1923, she, as trustee for the principal trust, was indebted to herself, as trustee for the separate trusts, in the amount of $2,872,433. In addition, she was indebted to herself, individually, in the amount of $80,871, and the trust carried a mortgage indebtedness of $3,750,000. Thus the principal trust at that time had an indebtedness, secured and unsecured, aggregating $6,822,803.

Respondent had been advised from time to time by her attorney that she had no right to carry the loans from the separate trusts as open accounts, and that under the terms of the will it was her duty to invest the income from the principal trust in property for the benefit of the separate trusts. He had also advised her that she had no right to restore or make separate trust funds out of the income of the principal trust, because this income was distributable to the separate trusts as income. In order to meet this situation and provide funds for the setting up of the separate trusts it was determined to reorganize the corporation, the stock of which all belonged to the principal trust, with the exception of one share which belonged to Mrs. Newbury, individually. Accordingly, a new corporation was organ-

ized on March 31, 1923, under the laws of Delaware, with a capital stock of 10,000 shares of no par value. This new corporation at once put out a note issue of $3,750,-000, which netted $3,655,518. The agreement under which the notes were issued provided that they should be the direct obligation of the corporation, and also that they should be guaranteed both as to principal and interest by Mrs. Newbury personally, that the corporation would pay no dividends except out of profits earned after April, 1923, that the corporation would maintain current assets of at least $4,000,-000, and that the notes should be paid within eight years after their issue, at a certain specified amount each year. The new corporation thereupon turned over the $3,655,-518, together with its 10,000 shares of capital stock, to the old Illinois corporation, in exchange for the capital stock of the latter. The business and assets of the Illinois corporation were then transferred to the Delaware corporation as of the date of February 1, 1923.

It is this transaction which the Commissioner sought to reach by his assertion of the deficiency in respondent's income tax payment for the year 1923, and he fixed the amount of the deficiency according to the amount of cash received by respondent in the exchange, namely, 12½% of the $3,-655,518, or $456,939, with a penalty of $85,-676 for delinquency. His theory was that the stock in the new corporation had a readily realizable market value of at least the March, 1913, value of the old corporation, hence all the cash received in the exchange constituted taxable gain. He found that the value of the stock as of March, 1913, was $4,768,965. Respondent does not challenge the determination of the 1913 value. She does, however, contend that the stock of the Delaware corporation received in exchange for that of the Illinois corporation had no readily realizable market value, hence, since the cash received in the exchange was less than the 1913 value of the 4999 shares of stock, the transaction resulted in no taxable gain.

A stipulation of facts was submitted upon the hearing before the Board. This stipulation included, among other facts, not previously referred to, a computation of the net value of the tangible assets of the Illinois corporation for the five years next preceding January 31, 1923, showing an average net value, exclusive of leaseholds, of $6,100,918. It also showed gross sales and profits for the years 1906 to 1928 indicating that for the period from 1919 to 1923, the gross profits were never less than $7,174,705, and well over $8,000,-000 for four of those years. Comparative balance sheets for the years 1913 and 1923 were as set forth in the margin.[1] A letter written by the president of the corporation in connection with the note issue, and used in the advertising of it, was introduced. This letter pointed out the remarkable growth of the business and the value of its assets.

The Commissioner introduced no evidence in addition to the facts stipulated by the parties. Upon the hearing, respondent examined seven witnesses to support her

**1 ASSETS**

|  | Jan. 25, 1913 | Jan. 20, 1923 |
|---|---|---|
| Land, buildings, fixtures and machinery | $    79,377.00 | $1,642,284.77 |
| Investments | 9,500.00 | 904,161.15 |
| Cash | 117,691.63 | 654,574.64 |
| Accounts receivable | 88,678.02 | 205,137.90 |
| Inventory | 2,129,834.89 | 3,293,872.51 |
| Deferred charges | 21.603.12 | 129,575.56 |
| Advance payment on dividends | 2,392,954.32 | ........... |
| Totals | $4,839,638.98 | $6,829,606.56 |

**LIABILITIES**

|  | Jan. 25, 1913 | Jan. 20, 1923 |
|---|---|---|
| Overdrafts | $    55,317.76 | $ ........... |
| Bills payable | 190,000.00 | ........... |
| Accounts payable | 327,022.84 | 214,359.44 |
| Unfilled orders | 767.25 | ........... |
| Surplus items | 1,588.18 | ........... |
| Accruals | ........... | 506,949.59 |
| Reserve for Taxes | 4,005.00 | ........... |
| Capital Stock | 500.000.00 | 500,000.00 |
| Surplus | 2,996,068.70 | 5,608,297.53 |
| Undivided profits | 764,869.25 | ........... |
| Totals | $4,839,638.98 | $6,829,606.56 |

80 F.(2d)—40½

contention that at the time of the exchange of stock, that of the new company had no readily realizable market value. These witnesses testified as to the burdensome character of the 1916 leases under which the corporation occupied the premises, the changes in business conditions as a result of which the corporation could not expect to do as profitable a business in the future as it had done in the past, the difficulty in selling a business like this one which would have to be disposed of as a unit, and which any buyer would be likely to find unattractive because of the fact that no dividends could be paid except out of earnings until the entire note issue was paid off, and in the meantime, current assets of $4,000,000 had to be maintained, and that the new corporation's note issue was required to be endorsed by Mrs. Newbury, personally, before it was placed on the market.

It seems clear from the facts which have been shown that there had been a substantial appreciation in the value of the assets of the corporation between March, 1913, and March, 1923, when the new corporation was organized to take over those assets. However, the question is whether the 1923 transaction was of such a character as to reflect that appreciation and render it taxable.

The 1921 Revenue Act (42 Stat. 227, 230) then in effect provided substantially that on an exchange of property, no gain should be recognized unless the property received in exchange had a readily realizable market value, and not even then, if it were in connection with a reorganization of one or more corporations whereby a person received in place of any stocks or securities owned by him, the stocks or securities of a corporation resulting from the reorganization. Sections 202 (c) and 202 (c) (2). By section 202 (e), as amended, it provided for the situation here involved, namely, the exchange, upon a reorganization, of corporate stocks, and the payment of money together with the stock of the new corporation: "the amount of the gain resulting from such exchange shall be computed in accordance with subdivisions (a) and (b) of this section, but in no such case shall the taxable gain exceed the amount of the money and the fair market value of such other property received in exchange." Section 202 (e), as amended March 4, 1923, 42 Stat. 1560, § 2, effective as of January 1, 1923.

The Board had previously construed this statute as meaning that under circumstances which indicated that it would be difficult, if not impossible, to find a buyer for certain stock who would be willing to pay anything like its fair value, that stock could not be said to have any readily realizable market value, hence unless the cash received in connection with an exchange of old stock for the new exceeded the book value of the old, no taxable gain could be said to result from the transaction. See Edwin W. Eisendrath et al. v. Commissioner, 28 B.T.A. 744. In another case it had said that the statute meant that to have readily realizable market value, property must be practically the equivalent of cash. See Alexander D. Falck v. Commissioner, 26 B.T.A. 1359. This was in accord with the definition promulgated by the Treasury Department in its regulations relative to the 1921 Revenue Act. Article 1564, Regulations 62, p. 310, provides that: " * * * Property has a readily realizable market value if it can be readily converted into an amount of cash or its equivalent substantially equal to the fair value of the property. In other words, the property received in exchange must be readily marketable at substantially its fair value in order that a gain or loss be recognized. * * * Stock in a close corporation may or may not have a readily realizable market value, depending upon all the facts in each particular case." Again, in Article 1565, p. 311, it is said that: "The amount of income derived or loss sustained from an exchange of property is the difference between the fair market value (if readily realizable) at the time of the exchange of the property received in exchange and the original cost, or other basis, of the property exchanged. * * * "

We think that in thus construing the statute, the Board and the regulations quoted properly emphasized the necessity that the property exchanged have a readily realizable market value in order for the exchange to result in a taxable gain. It is true, as argued by the Commissioner, that this does not mean that there must be actual sales in order for a particular stock to have such value. The cases upon which he relies amply support this proposition. See Fesler v. Commissioner (C.C.A.) 38 F.(2d) 155; Newell v. Commissioner (C.C.A.) 66 F.(2d) 102; O'Meara v. Commissioner (C.C.A.) 34 F.(2d) 390; Crowell v. Commissioner (C.C.A.) 62 F.(2d) 51; Old Colony Trust Company v. Commissioner (C.C.A.) 59 F.(2d) 168; Commissioner v. Swenson (C.C.A.) 56 F.(2d) 544; Helvering v. Kendrick

Coal & Dock Co. (C.C.A.) 72 F.(2d) 330. In the absence of actual sales on an open market, other factors may be considered in arriving at a valuation at which property could be sold if it were offered for sale. However, unless such sale would be at a fair price, reasonably approximating its intrinsic value, the stock cannot be said to have readily realizable market value.

It does not follow that, because there is in fact some intrinsic value back of the stock, it must be held to have readily realizable value within the meaning of the statute. It is quite possible for other factors to exist which prevent converting the intrinsic value of the property into cash or its equivalent at anywhere near its fair value. While the determination of the Commissioner as to the value should ordinarily be given great weight, nevertheless, when the taxpayer introduces substantial evidence tending to show that in fact no value can be realized except at a serious sacrifice, then that property can not be said to have readily realizable market value. We can not ignore the provision of the statute which imposes this requirement. It is of course very difficult of application, which fact was responsible for the abandonment of this particular term in the 1924 Revenue Act (43 Stat. 253). See Holmes on Federal Income Tax, (6th Ed.) § 334, and Gregg Report on Mellon Bill there quoted. We have no choice but to construe it to mean that where the stock in question could not have been sold at a price approximating what the Commissioner determined to be its intrinsic value, Congress did not intend that the taxable gain should be based on that intrinsic value.

. The finding of the Board was supported by substantial and undisputed evidence which tended to show, not only that the stock had no readily realizable value, but that under the facts found, it had no realizable value comparable to the value of its assets. Under those conditions we could not disturb the findings of the Board even if we were so disposed, which we are not, under all the facts presented.

The decision of the Board of Tax Appeals is

Affirmed.