ALEXANDER D. FALCK, PETITIONER, ET AL.,[1] *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 20452, 29252, 29389, 29444–29446, 29461, 29465, 37520, 37703, 37864. Promulgated October 26, 1932.

*William R. Green, Jr., Esq., Russell L. Bradford, Esq., William D. Flannery, Esq.,* and *Norman E. Webster, C. P. A.,* for the petitioners.

*T. M. Mather, Esq.,* for the respondent.

[1] Proceedings of the following petitioners are consolidated herewith: Corning Trust Company, Successor Trustee of the Estate of Henry P. Sinclaire; Eugene C. Sullivan; Estate of Amory Houghton, Jr.; Alanson B. Houghton; Arthur A. Houghton; George Buell Hollister; The Farmers' Loan and Trust Company as Trustee under the Last Will and Testament of Charles F. Houghton, deceased; Murray Sinclaire and William S. Heyniger as Executors of the Last Will and Testament of Henry P. Sinclaire, Jr., deceased; Helen B. Sinclaire, William W. Sinclaire and Paul Sinclaire as Executors of the Last Will and Testament of William Sinclaire, deceased; and Reginald Sinclaire.

1360

OPINION.

Murdock: The parties all agree that the exchanges in 1920 and 1923 were in connection with reorganizations of the corporation, and no gain or loss should be deemed to have occurred or should be recognized. See sections 202 (b) and 202 (c) (2) of the Revenue Acts of 1918 and 1921, respectively. Section 202 (e) of the latter act does not apply in this case, since the preferred stock was received in a nontaxable exchange and the subsequent sale was a separate transaction. The stock received in such exchanges must be treated as taking the place of that given for the purpose of computing subsequent gain or loss from the disposition of it. Section 202 (d) (1) of the Revenue Act of 1921. See also section 202 (b) of the Revenue Act of 1918. This means that the new stock takes the basis of the old. *Matthias W. Wildschutz*, 22 B. T. A. 1140; affd., 60 Fed. (2d) 689. Where only one kind of stock is received in the exchange, the application of this rule is simple enough and the act needs no elaboration. But here two classes of securities were received and the question is, How is subsequent gain or loss upon the disposition of these new shares to be computed? The act is not specific on this detail and the Commissioner, as he was authorized to do, has taken care of it in his regulations. Article 1567 of Regulations 62 deals directly with section 202 (d) (1) and the problem presented above, as follows:

If property is exchanged for two kinds of property and no gain or loss is recognized * * * the cost of the original property should be apportioned, if possible, between the two kinds of property received in exchange for the purpose of determining gain or loss upon subsequent sale. If no fair apportionment is practicable, no profit on any subsequent sale of any part of the property received in exchange is realized until out of the proceeds of sale shall have been recovered the entire cost of the original property. When securities of a single class are exchanged for new securities of different classes so that no gain or loss is realized * * * , for the purpose of determining gain or loss on the subsequent sale of any of the new securities the proportion of the original cost, or other basis, to be allocated to each class of new securities is that proportion which the market value of the particular class bears to the market value of all securities received on the date of the exchange.

This article of the regulations has been approved in *Curtiss et al.*, 21 B. T. A. 629; affd., 57 Fed. (2d) 847.

The petitioners apparently approve of the regulation, but they claim that the Commissioner has incorrectly applied it to the facts in these cases. They agree that the preferred stock at the date of the exchange in which they received it had a market value of $100 per share. But they contend that the common stock had no market value or that its market value could not be determined; that no apportionment of the old basis was practicable or possible; and that therefore no profit on the subsequent sales will be realized by any of them until that one has recovered his entire old basis. The Commissioner, except in the case of Falck, has computed a value for the common stock and has allocated the original bases accordingly in a manner which he claims is practicable and fair. Here we find the principal difference between the petitioners and the Commissioner.

The petitioners are beside the point in their argument that the common stock had no " readily realizable market value." Neither the act nor the regulation here involved requires that the market value should be readily realizable. The term " readily realizable market value " has been used in the revenue acts where the recipient of property in an exchange is to be taxed on the gain resulting from the exchange. Before such a transaction is considered to give rise to taxable gain under the statute, the property received in the exchange must have a readily realizable market value, i. e., be practically the equivalent of cash. In the present case value is not being used to take the place of cash as if it were the purchase price, itself giving rise to gain, but is being used only as a practical means of apportioning a basis to be subtracted from the purchase price in case the property is subsequently sold. The petitioners incorrectly assume that a strict interpretation of section 202 (d) (1) and the regulations would be favorable to taxpayers and therefore should be adopted under the rule that ambiguities or doubts in a taxing statute must be resolved against the government responsible for the wording used. They lose sight of the fact that it is impossible to determine what construction would be most favorable to taxpayers generally. Cf. *Brewster* v. *Gage*, 280 U. S. 327. The apportionment applies also to benefit taxpayers claiming losses. Other taxpayers may want to report their gains ratably as they dispose of their stock instead of lumping them, as these petitioners would prefer to do. In fact, these very taxpayers in the end may be benefited by this apportionment if they should sell the rest of their stock in a high tax year.

The various deficiency notices were introduced in evidence to show how the Commissioner arrived at the deficiencies. These show that

in every case, except that of Falck, he used certain figures representing the value of tangibles and the earnings of the Corning Glass Works in computing the profit from the sales of preferred stock. This action is now assigned as error by petitioners. If petitioners did not agree to the correctness of these figures, theirs was the duty to prove correct figures. This is not so in the case of Falck. The deficiency notice to Falck was a tacit approval of the method used by Falck in reporting his profit from the sale of his preferred stock. The Commissioner, by amended answer, alleges that he made a mistake in computing the Falck deficiency, and his profit on the sale of preferred stock should be computed as the Commissioner computed it in the other cases. Under our Rule 30 the burden of proof on this issue in the Falck case is on the Commissioner. We know that the company was operating profitably and paying dividends and its stock was worth more than the employees paid for it. But the record, in so far as it relates to the Falck case, does not contain evidence sufficient to enable the Board to determine affirmatively the market value of the common stock at the date of the last exchange or to apportion the original basis in order to arrive at Falck's profit.

If the Falck case had been heard separately, the failure of proof would be more apparent, but it is no less real because the cases were consolidated for hearing. Testimony and other evidence introduced at this hearing has general application, but the Commissioner is not aided in his case against Falck by evidence of how he computed the deficiencies against the other petitioners. The Commissioner introduced no evidence, but relied chiefly upon the presumptive correctness of his determinations. In the Falck case this was fatal to his affirmative contention.

The Commissioner does not ask us to rely blindly upon his determinations in the remaining cases. He has disclosed his method of valuation, a consideration of the value of the assets back of the stock. Cf. *Wright et al.*, 19 B. T. A. 541; *George F. Milton*, 17 B. T. A. 380; *George A. Ricker*, 10 B. T. A. 11. In order to determine the value of the intangible assets, he used a formula frequently relied upon for such purpose where there are no sales, i. e., he reduced the average earnings for five years preceding December, 1923, by 8 per cent of the average tangibles for the period and capitalized the remaining earnings at 15 per cent to arrive at the value of intangibles. This is the formula set forth in A. R. M. 34, C. B. 2, p. 31, used in the absence of better evidence or as a check in *Dwight & Lloyd Sintering Co.*, 1 B. T. A. 179; *Otis Steel Co.*, 6 B. T. A. 358; *Schilling Grain Co.*, 8 B. T. A. 1048. See also *Estate of Jacob Fish*, 1 B. T. A. 882; *Robertson v. Routzahn*, 1 Fed. Supp. 355. This value of intangibles he added to the value of tangibles as of December,

1923, to get the total value of the business. From this total value he deducted the known total value of the preferred stock and found that one share of common stock was worth $73.43 at the date of the last exchange. In this way he found that the total value of the preferred was 25.40 per cent of the total value of both classes of stock, so he allocated 25.40 per cent of the old bases to the preferred and computed profits accordingly. He also supports his determination by a rule of thumb, ten times earnings, which he says is a common and conservative method used by prospective investors to determine the value of securities. He points significantly to the fact that the petitioners, objecting to his method of determining the value of the common in 1923, at the same time agree to the value as of March 1, 1913, which he arrived at in exactly the same way. These arguments and the facts, appearing from the petitioners' evidence, that the business of the corporation was long and well established on a prosperous dividend-paying basis, the common stock was worth more than the employees paid for it, and the preferred sold at par when offered, about sum up the respondent's case.

The fact that the presumptive correctness of the Commissioner's determinations places the burden of proof upon petitioners in proceedings before this Board, so often relied upon by the Commissioner, as here, frequently makes the decision of cases difficult and unsatisfactory, where the introduction of evidence would have simplified matters. This burden-of-proof principle should not be pressed unduly to defeat taxpayers. *Mount* v. *Commissioner*, 48 Fed. (2d) 550. Yet it has its place and requires that the evidence, when fairly considered, preponderate in favor of the petitioners. *Wickwire* v. *Reinecke*, 275 U. S. 101; *Crook* v. *United States*, 30 Fed. (2d) 917; *Walls* v. *Commissioner*, 60 Fed. (2d) 347; *Avery* v. *Commissioner*, 22 Fed. (2d) 6; *Wright et al., supra;* affd., 50 Fed. (2d) 727; certiorari denied, 284 U. S. 652. In *Burnet* v. *Houston*, 283 U. S. 223, the court said petitioners are required " to produce the best available evidence of value which the circumstances and nature of the transaction permitted."

What have the petitioners produced as the best available evidence which the circumstances and nature of the transaction permitted? The respondent concedes that the common stock has been closely held and has never been sold or offered for sale to the public; also, that the sales to employees do not indicate a fair or reasonable market value. Such facts are material, but alone are not determinative as to whether the stock had a market value. *Insurance & Title Guarantee Co.*, 12 B. T. A. 452; affd., 36 Fed. (2d) 842; certiorari denied, 281 U. S. 748; *Chicago Ry. Equipment Co.* v. *Blair*, 20 Fed. (2d) 10, 14; *Wright et al., supra*. For additional proof of their

position the petitioners must rely chiefly upon the testimony of one witness, an assistant vice president of a trust company, of the city of New York, associated with its trust department. The company was executor and trustee under the will of Charles F. Houghton. When Houghton died in 1897 he owned a substantial block of stock in the Corning Glass Works, which he had willed should be sold by his executor or trustee as soon as practicable, provided however, that other stockholders should have a preference if they would pay as much as outsiders. None of this stock had been sold up to the time of the hearing, except the preferred sold in December, 1923. No other offers had been received for it and no other price fixed for any of it by the trust company at any time. The trust company from time to time urged the other stockholders to agree among themselves upon a price at which they would be willing to purchase. They never agreed. The trust company made no other attempt to sell the stock. The witness said he thought the other stockholders were the most likely purchasers and he knew of no other market. He was not presented as an expert witness upon valuation of securities. He said he never learned what the stock was reasonably worth. This value was unknown to him, but was it unknowable to one willing to make a reasonable effort to discover it?

We do not know the relationship of the various stockholders of the name Houghton. But about 86 per cent of the stock of the Corning Glass Works was owned by them. Under such circumstances, the failure of the trustee to sell may have been due to other reasons than lack of a real market. None of the stockholders or officials of the company were called as witnesses to give information which they might have about the value of the stock. None of the petitioners testified. No experts on valuation appeared to aid the petitioners or the Board. Perhaps the absence of some such possible witnesses was justified, but, before we should say that the stock had no market value and hold that the Commissioner's apportionment was not practicable, some more convincing evidence should be produced. We can not assume that an effort to produce better evidence would have been fruitless. None of the other stockholders were offering to dispose of their stock. Were they willing and able to buy more? What would they have given for more? How would they have determined the proper amount to offer and how would the trustee have determined the proper price to accept except by the aid of some such method as the Commissioner has used? If this method was faulty or inferior, why was this not shown to us in some way? We think we are not giving undue importance to the burden of proof nor are we unmindful of the difficulty of proving a negative in holding that these petitioners have failed to produce sufficient evidence to weigh the scales in their favor.

The petitioners argue that in some cases the determination of a market value is absolutely necessary, but there is no great necessity here, since their profit will be reported ultimately when they have recovered any amount in excess of the original basis and, if the final result is a loss, they will not be charged with a false interlocutory gain. This seems to be an attack upon the reasonableness and propriety of the use of market value in the regulation, whereas we understood the petitioners had no objection to it. We think the regulation was justified and proper. It serves both the taxpayer and the Government in many cases, apparent to anyone. It does not require apportionment of the basis in every case, but only where possible and practicable. These cases, with the exception of the Falck case, fall within the latter class, for it is not difficult to believe that this common stock might have sold at about the price which the Commissioner used.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

---

GOODRICH, dissenting: Except as to Docket No. 20452, I dissent from the majority opinion. I agree that whether the common stock had a " readily realizable market value " has nothing to do with the case. I agree also that section 202 (d) (1) is controlling here, that the new stocks received take the basis of the old stock for which exchanged, and that article 1567 of Regulations 62, having been approved as reasonable, should be applied in determining gain or loss upon subsequent sale of the stocks, or a part thereof, so acquired. The article requires that a " fair apportionment " of cost basis be allocated to each class of securities in " that proportion which the market value of the particular class bears to the market value of all securities received on the date of the exchange." The respondent has made an apportionment which is upheld by the prevailing opinion on the ground that petitioners have failed to overcome the presumptive correctness with which his determinations are armored—have failed to prove that the common stock had a market value different from that assigned to it by respondent. At this point I disagree. The evidence in this record is sufficient to convince me that the common stock had no market value, or if it had, that the value was not known, and that showing, in my opinion, is sufficient to overcome the presumptive correctness of respondent's determination of market value upon which he bases his apportionment. The stock undoubtedly was valuable and conceivably might have been sold at some price, but as to what that price would be, and whether it would be market value, we can only guess. Its book value and perhaps its intrinsic value might be determined quite accurately, but such values are not

necessarily the market value, as that term has been so often judicially defined. Since the regulation requires the apportionment to be based upon a comparison of the market values of the two classes of securities, it need not be argued that, in the absence of one of those factors, it is not possible nor practicable to make a " fair apportionment " between them by the method prescribed.

I realize that upon occasion, because of statutory requirements, a value, such as a fair market value as of March 1, 1913, or as of the date of death of a decedent *must* be determined, and that such determination, be it accurate or inaccurate, if reasonably bottomed upon fact, *must* be used as a basis for the computation of statutory tax liabilities. No such necessity confronts us here. We are seeking only to determine whether this common stock had a market value, so that it is possible or practicable to make an apportionment of a cost basis between it and a preferred stock of known market value. My conclusion is that its market value at the time received upon exchange was unknown and I see no necessity to attempt to fix that value by guess or to attribute to a stock of unknown market value, by means of arbitrary mathematical formulae, a portion of the cost basis, as respondent has done.

Therefore, in my opinion, the market value of the preferred stock received in the exchange should be applied against the basis of the original property and no profit on the sale of any of the property received will be realized until, out of the proceeds of such sales, shall have been recovered the entire cost of the original property.