Joseph Morgenstern, et al. [1] v. Commissioner. Morgenstern v. Commissioner
Docket Nos. 39868, 39869, 39871-39873, 39875, 39876. Memo. 1955-86.
United States Tax Court
T.C. Memo 1955-86; 1955 Tax Ct. Memo LEXIS 250; 14 T.C.M. (CCH) 282; T.C.M. (RIA) 55086; April 14, 1955
Richard Katcher, Esq., 1130 B. F. Keith Building, Cleveland, Ohio, and Leo J. Schwartz, Esq., for the petitioners. James F. Kennedy, Jr., Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: These cases, consolidated for hearing and consideration, involve deficiencies in income taxes determined against the respective petitioners as follows: Docket
Petitioner
Number
Year
Deficiency
Penalty
Joseph Morgenstern
39868
1945
$ 75,305.43
1946
112,487.23
1947
28,941.21
* $3,131.79
** 1,879.07
Joseph and Bertha Morgenstern
39869
1948
2,587.78
1949
914.82
Elliott Morgenstern
39871
1945
1,636.58
1947
3,246.69
* 374.48
** 224.69
Elliott and Ruth Morgenstern
39872
1948
749.01
1949
883.70
Electroline Sales Company
39873
1946
7,589.80
1948
4,917.97
David Morgenstern
39875
1945
17,309.36
1946
6,961.73
1947
5,282.15
* 651.44
** 390.86
David and Hannah Morgenstern
39876
1948
5,925.20
1949
3,043.14
*251 Increased deficiencies in income taxes were determined by respondent and presented in his amended answers as follows: Docket
Additional
Additional
Petitioner
Number
Deficiency
Penalty
Joseph Morgenstern
39868
$34,432.47
* $133.38
** 80.03
Elliott Morgenstern
39871
13,034.67
Elliott and Ruth Morgenstern
39872
532.52
David Morgenstern
39875
27,134.36 Petitioners Joseph and Bertha Morgenstern, Docket No. 39869, claim an overpayment of income tax for 1949. Because of certain concessions and stipulated facts, respondent claims increased deficiencies in all cases, except Docket No. 39873, for amounts, if any, which will be determinable only after the redetermination herein. An issue as to certain charitable contributions has apparently been abandoned by petitioners. The remaining questions are: 1. Whether the shares of the partnership income of Southwest Sealed Beam Company, Ltd., for the years 1945 and *252 1946 distributable to Bertha and Hannah Morgenstern are taxable to them or to their respective husbands, Joseph and David Morgenstern. 2. Whether the share of the partnership income of Atlantic Sealed Beam Co., Ltd., for the fiscal years ending February 28, 1946 and February 28, 1947, distributable to Esther Morgenstern is taxable to her or to her father, Joseph Morgenstern. 3. Whether the share of the partnership income of Cefkin Sales Company for the years 1945 and 1946 distributable to Esther Morgenstern is, for 1945, taxable to her or to the partnership Electroline Manufacturing Company and, for 1946, taxable in part to the partnership Electroline Manufacturing Company and in part to Electroline Sales Company; and whether the income if taxed to Electroline Sales Company is further taxable to Joseph Morgenstern as a dividend for 1946. 4. Whether the amounts expended by Electroline Manufacturing Company and Electroline Sales Company in 1947 and 1948 in acquiring title to certain automobiles constituted dividend income to Joseph, David and Elliott Morgenstern; and whether Electroline Sales Company is entitled to deduct depreciation on the automobiles so owned by it. 5. Whether *253 deductions claimed by petitioners as contributions to the American Committee for the Settlement of Jews in Birobidjan, Inc. and to the Yiddisher Kultur Farband, Inc. are allowable. Findings of Fact Certain facts have been stipulated and are hereby found accordingly. Joseph and David Morgenstern, residents of Cuyahoga County, Ohio, filed their individual income tax returns for the calendar years 1945, 1946 and 1947 with the collector for the eighteenth district of Ohio. Joseph and his wife, Bertha, and David and his wife, Hannah, filed their joint income tax returns for the calendar years 1948 and 1949 with the collector for the eighteenth district of Ohio. Elliott Morgenstern, a resident of Cuyahoga County, Ohio, filed his individual income tax returns for the calendar years 1945 and 1947 with the collector for the eighteenth district of Ohio. Elliott and his wife, Ruth, filed their joint income tax returns for the calendar years 1948 and 1949 with the collector for the eighteenth district of Ohio. Joseph and Bertha are the parents of David and Elliott and of Esther Morgenstern Gilman (not a petitioner). Electroline Sales Company, hereinafter sometimes called Sales, is a *254 corporation duly organized on September 25, 1940, under the laws of the State of Ohio. Its principal office is at 2622 East 51st Street, Cleveland, Ohio. Its principal business prior to 1944 was the manufacture and distribution of automotive and electrical accessories. During the years 1945 to 1948, inclusive, it had 200 shares of common stock outstanding and owned as follows: Bertha
122
David
63.26
Elliott
10
Joseph
1.74
Julius Klein
3 During these years its officers were: Joseph, president; Elliott, vice president; David, treasurer; and Julius Klein, secretary. These four individuals also constituted the Board of Directors. Income tax returns were filed for Sales on a calendar year and accrual basis for 1946 and 1948 with the collector for the eighteenth district of Ohio. On December 16, 1943, Joseph, David and Elliott entered into a written partnership agreement to be equal partners under the name Electroline Manufacturing Company, hereinafter sometimes called the Morgenstern partnership. This partnership bought or leased all the operating assets of Sales and began operating on January 1, 1944; it was terminated September 25, 1946, by transferring its *255 assets to a newly organized corporation, Electroline Manufacturing Company, hereinafter sometimes called Electroline. It was intended that the Morgenstern partnership would perform the manufacturing function while Sales would perform the distribution function, but the partnership did both during 1944 and 1945 and Sales was held in a prior proceeding in the Tax Court to be a personal holding company during those years. The partnership income tax returns were filed for the calendar year 1945 and for the period ended August 31, 1946, with the collector for the eighteenth district of Ohio. Electroline is a corporation duly organized on September 25, 1946, under the laws of the State of Ohio. Its principal office is at 2622 East 51st Street, Cleveland, Ohio. From its incorporation and throughout the years 1947 and 1948, Joseph was its president, and David was its secretary-treasurer. Joseph, David and Elliott constituted its Board of Directors. Under the terms of the Morgenstern partnership agreement, Joseph was to receive a commission of 5 per cent on all sales made by the partnership. In October 1945, the partnership agreement was orally amended to provide that no commission would *256 be paid to Joseph on sales made by the partnership on or after November 1, 1945. The partners' distributable shares of partnership income for 1945 were, in accordance with the amended partnership agreement: Joseph
$415,458.79
David
281,872.79
Elliott
274,656.79
Total
$971,988.37 and for the taxable period ended September 25, 1946, were equal shares of the partnership income of $126,559.73. The principal product manufactured and sold by the Morgenstern partnership was the sealed beam adapter, a headlight unit which fitted all pre-1940 automobiles. Although the demand for this product was heavy during the immediate postwar period, the partnership had no monopoly on the manufacture of these sealed beam adapters; it had competitors in all the years in question. In 1944, the partnership was selling its products, primarily in the eastern and midwestern states, through manufacturers' agents. These agents handled products of other manufacturers as well as those of the Morgenstern partnership, and, until the beginning of 1945, the partnership did not have adequate distribution facilities for the adapters in the South, the Southwest and the Far West. It was dissatisfied *257 with the sales results obtained by these manufacturers' agents but was in no position to build up its own sales force. It was low on personnel, and salesmen were difficult to obtain at that time; its partners' experience lay in other fields - Joseph's background was in the electrical field, and David's efforts were concentrated in tooling, design and production. Late in 1944, there was an increasing demand and market for the sealed beam adapter kits because no new cars were being produced and those on the road needed headlight replacements. Because the public had not been able to buy new cars during the war and the cars which were on the road were of considerable age, the production and sales of new cars would obviate the need for the sealed beam adapter kits. The end of the war appeared near and it was considered important for the partnership to produce and sell sealed beam adapter kits in as short a time as possible, and in sufficient quantities to meet the demand. It was decided that the partnership should concentrate its efforts on producing sealed beam adapter kits because it had no sales force of its own and it lacked the time, money, and experience to develop such a sales *258 force. Julius Klein was an employee not related to the Morgensterns. He suggested that the Morgenstern partnership set up a sales organization in the Southwest where it had not previously concentrated its selling efforts and that it appoint such organization as its exclusive sales agent for the distribution and sale of sealed beam adapters. Pursuant to Klein's suggestion, A. H. Hirsig, of Hirsig-Frazier Company of Dallas, Texas, was invited to come to Cleveland to discuss the formation of a sales organization to operate in the southwestern states. Hirsig-Frazier served as a manufacturers' agent and did not usually store or handle any merchandise. Hirsig, who is unrelated to the Morgenstern family, accepted the invitation and participated in discussions in Cleveland with Klein, Joseph and David. As a result, a limited partnership, Southwest Sealed Beam Company, Ltd., hereinafter sometimes called Southwest, was formed under the laws of the State of Texas. During these discussions, it was made clear by Joseph and David that the Morgenstern partnership wanted to concentrate its efforts on the purchase of materials and the manufacture and delivery of sealed beam adapters. They wanted *259 to have one billing source in the Southwest, an agency with the responsibility of dealing with the customers, checking their credit, conducting the sales work, and assuming the risks involved. An understanding to this effect was reached. Discussions were also conducted at this time, precedent to the appointment of Southwest as the exclusive sales agency and precedent to the signing of the Southwest partnership agreement, as to the price at which the Morgenstern partnership would sell to Southwest. Hirsig and Klein asked a 25 per cent discount off list price, but, after some discussion, it was agreed that Southwest would be allowed a discount of 20 per cent. In arriving at this discount, consideration was given to the operating expenses, including salesmen's commissions, to be incurred by Southwest. A like discount was allowed to other purchasers who, similarly, bought in large quantities, saved the salesman's commission, and assumed the burdens of distribution. On January 15, 1945, Hirsig, Klein, Bertha and Hannah entered into the Southwest partnership agreement for the purpose of acting as exclusive sales agent for the Morgenstern partnership in the sale of sealed beam adapters *260 in the southwestern states. Under the terms of the Southwest agreement, Hirsig was the general partner and Klein, Bertha and Hannah were special partners. Hirsig contributed $500, Klein $1,250, Bertha $2,150, and Hannah $1,100 to the initial $5,000 of capital. By reason of such contributions, Hirsig was entitled to 10 per cent, Klein to 25 per cent, Bertha to 43 per cent, and Hannah to 22 per cent of the yearly profits. The opportunity to invest in Southwest was brought to Bertha's attention by Joseph and then Klein, and was brought to Hannah's attention by David. Bertha also met Hirsig at the time the proposed partnership was discussed. At the time Southwest was formed, Bertha had assets of her own, including real estate, shares of Sales, and about $1,800 in her bank accounts. Hannah had assets of her own, including about $1,000 in her checking account, a few hundred dollars in her savings account, approximately $2,500 in war bonds and $4,500 owed by David. The funds for Bertha's investment in Southwest came as a result of a gift from Joseph to her. The funds for Hannah's investment in Southwest came as a result of a loan repayment from David to her. Southwest commenced operations *261 in January 1945, and terminated its activities on or about December 31, 1946. As agreed, Southwest solicited orders, made the sales, billed its purchasers and collected from them; Southwest sent its orders to the Morgenstern partnership which then shipped the merchandise directly to the customers of Southwest and billed Southwest for the merchandise. Southwest checked the credit of its customers and assumed the risks of such accounts. Hirsig, as general partner, supervised the partnership operations; Bertha and Hannah, as special partners, rendered no services. Southwest had its principal office and maintained its bank account in Dallas, Texas. Checks drawn on this account required the signature of Hirsig or Ethel Rowse and the countersignature of Klein or Rena Cohn. Ethel Rowse was an employee of Hirsig in Dallas; Rena Cohn was an employee of the Morgenstern partnership in Cleveland. Joseph and David were not authorized to, and in fact did not, draw on the Southwest bank account. The books and records of Southwest were maintained at its office in Dallas, and Southwest filed its income tax returns for the calendar years 1945 and 1946 with the collector at Dallas. These returns were *262 prepared by a certified public accountant with offices in Dallas, and listed Hirsig, Klein, Bertha and Hannah as partners of Southwest. The ordinary net income of Southwest for the calendar year 1945 was $101,529.08, and, on the basis of the partnership agreement, $43,657.50 was distributable to Bertha and $22,336.40 to Hannah. The ordinary net income of Southwest for the calendar year 1946 was $91,141.56, and, pursuant to the partnership agreement, $39,190.87 was distributable to Bertha and $20,051.14 to Hannah. Bertha filed income tax returns for the years 1945, 1946 and 1947 with the collector for the eighteenth district of Ohio. In these returns she reported her income from Southwest as $39,775 in 1945, $35,475 in 1946, and $7,310 in 1947. Respondent determined overassessments of $23,907.57, $12,813.79 and $1,434.51, resulting primarily from the elimination of these amounts from Bertha's returns. None of these amounts was reported as income by Joseph on his income tax returns. The Southwest distribution checks were sent to Klein in Cleveland, and he distributed them to Bertha and Hannah. In 1945, Bertha deposited approximately $21,000 of her distributive share of Southwest *263 income in her individual savings account, on which Joseph had no right to draw; she used the balance to pay taxes on the income and to make a loan to her nephew. In 1946, Bertha deposited approximately $2,100 of her distributive share of Southwest income in her individual savings account and lent the balance to the Morgenstern partnership, which in 1946 needed operating funds and borrowed from all sources, including friends and other relatives. It repaid Bertha, partly by investing $20,000 for her in preferred stock of Electroline. Bertha used the rest of the repayments to buy $6,000 in stock of Halex Realty Company, make contributions of about $14,000, and pay income taxes on her 1946 income. Hannah filed income tax returns for the years 1945 and 1946 with the collector for the eighteenth district of Ohio. In these returns she reported income from Southwest of $24,859.38 in 1945 and $20,051.14 in 1946. Respondent initially determined that Hannah overstated her distributable share of the Southwest income in her 1945 return by $2,522.98 and determined an overassessment of $1,243.54 which was refunded to her. Subsequently, respondent determined further overassessments of $8,524.57 *264 and $6,202.74 for 1945 and 1946, resulting from the elimination of the amounts reported by Hannah as distributable income from Southwest. Neither of these amounts was reported as income by David on his income tax returns. In 1945, Hannah deposited her distributive share of Southwest partnership income in her individual bank accounts. In 1945, Hannah withdrew from these bank accounts $1,000 to make a wedding gift to her brother and $10,000 to purchase war bonds. In 1946, Hannah deposited part of her distributive share of Southwest earnings in her bank accounts, used part to pay her income taxes amounting to $6,202.74, and lent part to her husband. In 1946, Hannah gave David the $10,000 of war bonds which she had purchased with her 1945 Southwest earnings for his use as collateral on a loan which the Morgenstern partnership was making at a bank. When these bonds were no longer required as collateral for the bank loan, they were cashed and the proceeds were lent to the Morgenstern partnership for operating purposes. In 1947, David purchased a residence for $43,000 in the names of himself and Hannah. Within 6 months of the purchase date, David had paid $27,000 in cash, from his own funds, *265 on the purchase price. In addition, payments of between $5,000 and $6,000 on the $16,000 first mortgage and payments of about $9,000 for additions to the house have been made by David from his own funds. In 1949, Hannah lent about $6,000, funds which she acquired as an heir of her father's estate, to companies in which David then had interests. These loans were subsequently repaid. Bertha did not use her personal funds to pay household and living expenses; after 1944, Joseph continued to pay these expenses, as he had done prior thereto. Hannah did not use her personal funds to pay household and living expenses; after January 1945, David continued to pay these expenses, as he had done prior thereto. Neither Joseph nor David rendered services to Southwest, received compensation from it, made sales on its behalf, or loaned any money to it. Both Bertha and Hannah considered their earnings as their own money derived from the capital contributed by them to Southwest. In January 1945, when Joseph was in Florida on vacation, Lawrence Hirsig called Cleveland for the purpose of talking about the formation of a sales company in the southern part of the country. Lawrence Hirsig was a nephew *266 of A. H. Hirsig and had learned from him about the formation of Southwest. Lawrence and Constance Hirsig, husband and wife, already operated a company as a manufacturer's representative in Jacksonville, Florida, and, upon being advised that Joseph was in Miami, Lawrence arranged a meeting in Miami to discuss the possibility of forming a sales company to represent the Morgenstern partnership in the southern states. Lawrence, Joseph and Marvin Nashkin met in Miami for such a discussion. Nashkin, a resident of Florida, was a friend of the Morgenstern family who had asked to represent Joseph in Florida. Neither Lawrence Hirsig, Constance Hirsig nor Marvin Nashkin was related to any member of the Morgenstern family. The Morgenstern partnership had not previously operated through manufacturers' representatives in the southern states. As a result of these discussions, an agreement was reached to form a limited partnership, Atlantic Seal [Sealed] Beam Co., Ltd., hereinafter sometimes called Atlantic, under the laws of the State of Florida. Discussions were also conducted as to the price at which the Morgenstern partnership would sell to Atlantic. Lawrence Hirsig was familiar with the arrangement *267 that A. H. Hirsig had entered into on behalf of Southwest with respect to a 20 per cent discount off list price, and it was agreed that a similar discount would be allowed to Atlantic. These discussions preceded the appointment of Atlantic as exclusive sales agency of the Morgenstern partnership and preceded the signing of the Atlantic partnership agreement. On March 27, 1945, Esther, Constance Hirsig and Marvin Nashkin entered into a partnership agreement under the name of Atlantic for the purpose of acting as exclusive sales agent for the Morgenstern partnership in the sale of sealed beam adapters in the southern states. Esther first heard about Atlantic from Joseph. Under the terms of the Atlantic partnership agreement, prepared by a Florida attorney, Esther was the general partner and Constance Hirsig and Marvin Nashkin were special partners. On May 4, 1945, a certificate of Articles of Limited Partnership was filed with the Secretary of State of the State of Florida. Esther contributed $3,000, the only capital contributed, and Constance Hirsig and Marvin Nashkin each contributed their services. The articles of partnership provided that Esther was to receive 80 per cent, Constance *268 Hirsig 10 per cent, and Marvin Nashkin 10 per cent of the Atlantic profits. The funds for Esther's contribution came as a gift from Joseph to Esther. To limit Constance Hirsig and Marvin Nashkin to 20 per cent of the profits, Esther desired that no capital be contributed by them. Atlantic had its principal office and maintained its bank account in Jacksonville, Florida. Checks drawn on this account required the signature of Esther, or her attorney-in-fact, and the countersignature of Constance Hirsig. Esther executed a power of attorney on March 27, 1945, authorizing Anita Wolf, her attorney-in-fact, to sign checks of Atlantic. The books and records of Atlantic were maintained at its office in Jacksonville. Atlantic filed its income tax returns for the fiscal years ending February 28, 1946, and February 28, 1947, with the collector in Florida. Each of the returns listed Esther, Constance Hirsig and Marvin Nashkin as partners of Atlantic. Atlantic commenced operations as exclusive sales representative for the Morgenstern partnership in March 1945, and terminated its activities on or about February 28, 1947. As agreed, Atlantic solicited the orders, made the sales, carried the accounts, *269 billed customers and collected from them. Atlantic sent its orders to the Morgenstern partnership, which then shipped the merchandise directly to the customers of Atlantic and billed Atlantic for such merchandise. Atlantic checked the credit of its customers and assumed the risks of such accounts. Constance Hirsig handled the books and records and Marvin Nashkin called on the trade, although the latter never received direct credit for any sales or visited the office of Atlantic in Jacksonville. The ordinary net income of Atlantic for its fiscal year ended February 28, 1946 was $48,129.22, and, on the basis of the partnership agreement, $38,503.38 was distributable to Esther. The corrected ordinary net income of Atlantic for its fiscal year ended February 28, 1947 was $40,321.24, and, on the basis of the partnership agreement, $32,257 was distributable to Esther. Esther filed income tax returns for 1946 and 1947 with the collector for the eighteenth district of Ohio, and in the returns she reported income from Atlantic of $38,503.38 for 1946 and $32,830.97 for 1947. Respondent determined overassessments of $13,161.69 for 1946 and $12,544.88 for 1947, resulting primarily from the elimination *270 of the amounts reported by Esther as distributable income from Atlantic. None of these amounts was reported as income by Joseph on his income tax returns. In 1945, Esther was living in New York, where she was painting and attending school. She was under the care of a psychoanalyst who suggested that it would be to Esther's benefit to have her father handle all her affairs and relieve her of such responsibilities. Esther discussed the doctor's suggestion with her father in Cleveland, and, as a result, she executed, on July 2, 1945, a general power of attorney whereby she named her father as her attorney-in-fact. By its terms, Joseph was authorized, among other things, to act for Esther in all businesses with which she was then connected or with which she might in the future be connected, including the power to invest or reinvest the money derived from any such businesses, and the power to withdraw money from the bank, to sign her name to all instruments and documents, and to endorse for her all checks in her name. The Atlantic distribution checks representing Esther's share of the partnership earnings were sent directly to Joseph, who sometimes deposited these checks in his personal *271 bank account, and sometimes loaned the proceeds to the Morgenstern companies. Joseph later opened a bank account in Esther's name. By reason of the power of attorney, Joseph considered his relationship to Esther as that of a trustee, and he always regarded the funds which he received on behalf of Esther as belonging to her. He received approximately $80,000 of earnings that belonged to her and applied them to the payment of Esther's income taxes for the years 1945, 1946 and 1947; to investments in Esther's name in stock of Halex Realty Company, Halex Die Casting Company and Electroline of Canada; to a loan in Esther's name to Halex Realty Company; and to her psychoanalyst for services rendered. Further, approximately $14,000 was contributed in Esther's behalf to various charitable organizations, and between $4,000 and $5,000 was spent by Esther in making trips to Europe and Mexico. When Esther first went to New York she received a monthly allowance of $200 from Joseph; later she requested, and received, an average of $350 a month both during and after the existence of Atlantic. Neither upon the termination of Atlantic, nor at any other time, was Esther given money by Joseph with the *272 understanding that it represented the entire balance of her profits from Atlantic. On some occasions Joseph advised Esther of his actions with respect to her money. Joseph rendered no services to Atlantic; received no compensation from it; made no sales on its behalf; and never lent any money to it. Esther considered her earnings as her own money derived from the capital contributed by her to Atlantic. Neither Southwest nor Atlantic had physical quarters separate and apart from the two Hirsig sales organizations. The articles of partnership of both Southwest and Atlantic provided for monthly distribution of all profits, and most of the profits were currently distributed. Capital was an unimportant income-producing factor to both companies. Another exclusive sales agency which the Morgenstern partnership appointed to represent it was Western Devices Distribution Company, hereinafter sometimes called Western Devices, a limited partnership operating in California and the surrounding states. It was composed of Myers, Solomon and Bosten, none of whom was related to any member of the Morgenstern family. Western Devices conducted its operations in the same manner as did Southwest and *273 Atlantic. It solicited the orders, made the sales, carried the accounts, billed customers and collected from them. It sent its orders to the Morgenstern partnership, which shipped the merchandise directly to the customers. Western Devices checked the credit of its customers and assumed the risks of such accounts. The Morgenstern partnership sold its products to Western Devices at 20 per cent off its list price, the same price charged to Southwest and Atlantic. Joseph and David rendered no services to Western Devices, received no compensation from it, and exercised no control over its affairs. During 1946 the demand for sealed beam adapters fell off sharply, primarily because new cars equipped with sealed beam adapters were on the market. The Mrgenstern men, cognizant of this fact, decided to manufacture a new line of automotive items. These items were of a competitive nature, and the Morgensterns felt that it would be to their corporations' detriment to continue their exclusive sales arrangements with Southwest, Atlantic and Western Devices. Accordingly, at the end of 1946, they advised Southwest, Atlantic and Western Devices that their companies were terminating their exclusive *274 sales arrangements with the partnerships. At the end of 1944, Mischa Cefkin, a friend of the Morgenstern family, came to Cleveland to ask for a job as the New York representative of the Morgenstern partnership. Joseph advised him that he would need capital to pay his expenses until the volume of sales was sufficient to enable his to earn commissions. Cefkin was not in a position to advance any funds and the suggestion was made by Joseph that Cefkin discuss with Esther the possibility of a partnership arrangement between the two of them. Cefkin discussed the matter with Esther and Joseph, and, as a result, Cefkin and Esther entered into a partnership agreement on February 26, 1945 under the name of Cefkin Sales Company for the purpose of acting as the representative of the Morgenstern partnership in the District of Columbia and the states of New York, Pennsylvania, New Jersey, Maryland, and Delaware. Esther contributed $1,000 as the initial capital and also agreed to contribute her services; Cefkin contributed his services to the partnership. The profits and losses were to be divided equally between Cefkin and Esther. Receipts were to be deposited in the Cleveland Trust Company in *275 Cleveland and profits were to be distributed on a monthly basis. Esther borrowed $1,000 from Joseph to make her contribution to Cefkin Sales Company. Her services consisted of taking one or two telephone messages per day from customers and relaying those messages to Cefkin. She had frequent contact with Cefkin, both personally and by telephone. In actual operation, Cefkin spent his full time soliciting orders and transmitting them to Cleveland for processing and shipment. The operation on his part involved no inventory, no carrying of accounts, no bookkeeping, nor collection of any kind. The Cleveland companies checked the credit of the customers, billed the customers for the merchandise, shipped the merchandise directly to them, maintained the books and records with respect to such orders and carried the accounts. For its services as manufacturer's agent, Cefkin Sales Company received a 7 1/2 per cent commission on sales. This commission was arrived at after discussion between the Morgenstern partnership and Cefkin. The Morgenstern partnership was paying a like commission to about 20 other manufacturers' agents. At Cefkin's insistence, the partnership agreement was amended on *276 November 1, 1946, because he felt that the services he was rendering to the partnership entitled him to a larger share of the profits. By reason of this amendment, all of the expenses of the partnership were to be charged to Esther's 50 per cent share of such profits. At Cefkin's suggestion, an agreement to dissolve was entered into as of June 1, 1947. Esther's distributable shares of the Cefkin Sales Company partnership earnings, which had been paid to it by the Morgenstern partnership in 1945 and until September 25 of 1946 and which had been paid to Cefkin Sales Company by sales during 1946, were $4,123.55, $1,019.84, and $4,540.99, respectively. In 1945, prior to executing the power of attorney to Joseph, Esther received directly some of the Cefkin Sales Company distribution checks. Thereafter, they were received by Joseph, pursuant to this power of attorney. Upon collecting the proceeds of the sales made by commission salesmen such as Cefkin, the Morgenstern companies in Cleveland treated such proceeds as gross income and deducted as business expenses the commissions paid to the salesmen. Joseph rendered no services to Cefkin Sales Company, received no compensation from it, *277 and made no sales on its behalf. Esther's income tax returns reflected her distributable share of the Cefkin Sales Company partnership earnings. None of these amounts was reported by Joseph on his income tax returns. Esther considered the earnings as her own money derived from the capital contributed and the services rendered by her to the Cefkin Sales Company. On May 17, 1947, Electroline acquired title to a Pontiac sedan by purchase at a cost of $2,110.96. This automobile was used by David in driving between the three Electroline plants and in making out-of-town trips on behalf of the corporations. It was also used by other employees of the corporation. In 1947, David personally owned a Hudson automobile. On October 18, 1947, Sales acquired title to a Lincoln sedan by purchase at a cost of $2,993.37. Joseph used the automobile in traveling between the Electroline plants and in making out-of-town trips on behalf of the corporations. Other employees of Sales used this automobile in the performance of their corporate services. Joseph also used this automobile for personal purposes; he owned no car. On August 30, 1947, Sales acquired title to a Pontiac sedan by purchase at a cost *278 of $2,118.93. In November 1948, Sales sold this Pontiac for $1,800 and replaced it on December 7, 1948, when Sales acquired title to a Kaiser DeLuxe by purchase at a cost of $2,607.74. Each of these two automobiles was used by Elliott in traveling between the plants of the corporations and in making out-of-town trips on behalf of Sales. Elliott also used these automobiles for personal purposes; he owned no car. The automobiles in controversy were used for business purposes one-third of the time, the remaining two-thirds use being for the personal benefit of David, Joseph and Elliott, respectively. The below-named petitioners claimed deductions on their income tax returns for contributions to the American Committee for the Settlement of Jews in Birobidjan, Inc., hereinafter sometimes called Ambijan, and to the Yiddisher Kultur Farband, Inc., hereinafter sometimes called IKUF, as follows: Taxpayer
Year
To Ambijan
To IKUF
Joseph
1945
$ 7,525.00
$2,450.00
Joseph
1947
1,000.00
David
1945
15,000.00
David
1947
2,000.00
David and Hannah
1948
1,100.00
Elliott and Ruth
1948
50.00
Elliott and Ruth
1949
500.00
1,350.00
Sales
1946
6,000.00
*279 In addition to the above list of claimed deductions to Ambijan and IKUF, the Morgenstern men deducted their allocable portions of partnership contributions. The $2,000 contribution claimed by David for the year 1947, the $1,100 contribution claimed by David and Hannah for 1948, and the $6,000 contribution claimed by Sales for 1946 were disallowed by respondent in his statutory notices. All other claimed deductions, above-listed, were originally allowed, but later, in amended answers, disallowed. In 1946, the directors of Sales discussed making a contribution to Ambijan, and agreed that Sales would make a $6,000 contribution to that organization. The contribution was made on behalf of Sales, charged to donations on its books and deducted on its income tax return. In the Morgenstern partnership return for the calendar year 1945, contributions were listed in the total amount of $73,147.60 of which $40,000 was to Ambijan and $1,600 was to IKUF. The total contributions listed in the partnership return were claimed by the partners on their individual returns as follows: Joseph
$36,147.60
David
17,500.00
Elliott
19,500.00
$73,147.60 Included in the contributions *280 reported in the Morgenstern partnership return for the period ended August 31, 1946, was a $10,000 donation to Ambijan which was attributable in equal proportions to Joseph, David and Elliott. For the calendar years 1946 and 1947, Esther reported contributions to Ambijan in the amounts of $5,600 and $800, respectively. For these years Esther was treated by respondent as being a dependent of Joseph, and the deductions claimed were, accordingly, allowed to him. About August 20, 1935, Ambijan was incorporated under the laws of the State of New York. Sometime in 1946 it absorbed an organization known as ICOR (Association for Jewish Colonization in the Soviet Union). After the absorption, the publication of Nailebn, a monthly periodical which had been published by ICOR, continued uninterruptedly until the dissolution of Ambijan in 1950. During its corporate life Ambijan also published a periodical known as the Ambijan Bulletin. In 1928 the Soviet Union designated Birobidjan - an area located in the far eastern part of the Soviet Union near Manchuria - as a Jewish Settlement, and in 1934 designated it as a Jewish Autonomous Region. Through the Soviet government, Russian Jews were settled *281 in this area. Prior to its organization, Ambijan secured permission to settle non-Russian Jews in this area and one of the purposes stated in its certificate of incorporation was the facilitation of the settlement in the Soviet Union - and primaily Birobidjan - of Jews residing outside the Soviet Union. Ambijan's history, as reported in its publications, indicates that it intended originally to finance the settlement of destitute non-Russian Jews in Birobidjan where the settlers would become a part of the community; and that Ambijan and ICOR sent machinery, textiles, food, housing and other goods to the Jewish Autonomous Region, to be delivered to the chairman of that government, to aid in the development of the area and increase its capacity to accept more settlers. Ambijan, through its publications, emphasized the significance of the Birobidjan settlement in furthering the national aspirations of Jews. The publications also contained articles which, among other things, denounced the Truman Doctrine, the Marshall Plan and the Atlantic Pact; criticized the British and United States Governments for creating an environment in which anti-Semitism was fomented, and appraised political *282 positions taken by the governments of the world. IKUF was incorporated in 1942 as an outgrowth of another organization of the same name which came into existence in 1938. The purpose of IKUF as stated in a questionnaire submitted to the Bureau of Internal Revenue was "To enhance the appreciation of cultural values and the educational standing of its members and sympathizers." During the years here involved IKUF published a periodical entitled Yiddishe Kultur. Approximately 80 per cent of the articles appearning in Yiddishe Kultur dealt with literary matters such as book reviews and discussions by authors; a certain percentage dealt with cultural problems that had other ramifications. The editorial policy was to present both sides of controversial questions. Among the writings appearing in Yiddishe Kultur during 1949 are two articles defending the Soviet Union against charges of anti-Semitism, charges said to be lies originating with and supported by reactionary circles. Opinion I. There is nothing in the circumstances of any one of the three partnerships adequate to distinguish these situations in principle from Willis H. Vance, 14 T.C. 1168. And while occasions *283 may arise in essentially personal service businesses where the income is produced by someone other than the owner with corresponding tax consequences, cf. Lyman A. Stanton, 14 T.C. 217, affd. (C.A. 7) 189 Fed. (2d) 297, that is so because such services are the generating source of the income. Here it is not even contended by respondent that Joseph, David or Elliott Morgenstern contributed any services to the businesses for whose income respondent seeks to tax them. "The petitioner in the present case did not earn the income in question. It does not appear that capital was a material income-producing factor or that the petitioner's wife contributed services vital to the two partnerships, but that is not determinative where, as here, the income can not be attributed either to capital contributed by the husband or to services performed by him. Simmons v. Commissioner, 164 Fed. (2d) 220. This is a stronger case for the taxpayer than Kent v. Commissioner, 170 Fed. (2d) 131." [Clifford R. Allen, Jr., 12 T.C. 227, 231.] Respondent has made some effort to support his position by the suggestion that the discounts or sales *284 commissions which constituted the income of the three partnerships were excessive. In the case of two of the three partnerships, his request to amend his pleadings to press this contention and invoke the provisions of section 45, Internal Revenue Code of 1939, appeared to be inconsistent with the stipulation of facts and was denied on petitioners' timely objection. But, in any event, the evidence fails to establish a factual basis for any such conclusion. As to all three of the partnerships, the record shows that the discounts or agents' commissions were no greater than those ordinarily contracted for by the Morgenstern companies in other similar situations. This is especially true as to Cefkin Sales, the only instance where the issue is properly before us. There our findings show that some 20 other agencies had similar arrangements. We have, accordingly, concluded as to the partnership issues that the deficiencies were erroneous. II. Respondent has disallowed the depreciation claimed by the corporate-petitioner on certain automobiles. He has in addition charged some of the individual petitioners with the equivalent of a dividend to the extent of the cost of the automobiles. We *285 are satisfied that to some extent these cars were used in the corporate business. As to so much there is no justification for disallowing the depreciation items. Rodgers Dairy Co., 14 T.C. 66. From the record we have made the most exact possible allocation between business and personal use under the Cohan rule [2] in order to determine what proportion of these items is allowable as deductions to the corporate-petitioner. Rodgers Dairy Co., supra.There is, however, no showing that the balance was treated or intended as additional compensation to the corporate-officers who employed the cars for their personal use. Its disallowance must, accordingly, be sustained. Fred W. Leadbetter 39 B.T.A. 629. Respondent made no determination that any part of the depreciation was chargeable to petitioners as a dividend. In this respect the case is like Louis Greenspon, 23 T.C. - (October 28, 1954), and differs from Rodgers Dairy Co., supra. Here, as in Greenspon, respondent determined that the entire cost of the automobiles should be charged as a dividend to the individual *286 petitioners. We said there: "* * * while it is appropriate for the respondent to disallow depreciation taken on the * * * equipment owned by Louis Greenspon, Inc., we do not think that the cost of these items should be added to Greenspon's personal income. * * * Greenspon did not own them, and their cost should not be included in his income. We do not decide the question whether under similar facts a stockholder making use of property owned by a corporation should be charged with receiving income to the extent of the value of the use of such property, as this question was not raised by the Commissioner * * *." Following that case, the deficiency determined against the individual petitioners in this respect is disapproved. III. Most of the disallowances of contributions to the agencies whose eligibility under section 101(6) is questioned were made for the first time in respondent's amended answers. In only three instances, those relating to the contributions to Ambijan by petitioners David Morgenstern for 1947, David and Hannah Morgenstern for 1948, and Electroline Sales Company for 1946, was the determination made in the original deficiency notice. The ground given was lack of substantiation *287 for the first two, and a determination as to petitioner Electroline Sales that the contributions were in fact made not by the corporation but on behalf of individual stockholders. Respondent recognizes that against such a background a possibility exists that the determination will follow the burden and that each side may fail in the instance where it has the risk of nonpersuasion. Alexander D. Falck, 26 B.T.A. 1359, affd. Houghton v. Commissioner, (C.A. 2) 71 Fed. (2d) 656; Nathan Cohen v. Secretary of War, 7 T.C. 1002. We think that this must be the result in the present case. A careful study of the testimony and exhibits leaves the evidence in such equipoise as to fail to convince us that the contention of either side has been proven. There are some circumstances which lend support to respondent's proposition that the two organizations in question were primarily propaganda devices or at least so much so as to fail to conform to the test established in Slee v. Commissioner, (C.A. 2) 42 Fed. (2d) 184, and the amended provisions of section 101(6). [3] But on the other hand the traditional aspiration of the Jews for an autonomous *288 state, and the support which migrants to Birobidjan and the colony itself there established were given by Ambijan, are likewise evident. Some appeal to the contributing public was clearly appropriate. We cannot say that the record is persuasive that the organization's activity was necessarily outside the provisions of the statute or of the permissible scope of what is merely ancillary and helpful in the successful prosecution of such an endeavor. American Society of Cinematographers, Inc., 42 B.T.A. 675. See Slee v. Commissioner, supra.
*289 By the same token the record contains no convicing proof that IKUF was not organized and operated exclusively for educational and literary purposes. Only two examples of its activity during the years in issue were introduced and there is evidence from which it might be concluded that these are not representative nor adequate to condemn its entire operation. It follows that petitioners have not proven that Ambijan necessarily complied with the legislative requirements; but that respondent has likewise failed to prove that the organizations in question did not. For this reason we have made no ultimate finding of fact on this issue. See Nathan Cohen v. Secretary of War, supra. And we find it unnecessary to reach a conclusion as to petitioners' contention that the contributions should be allowed because during the years in controversy there was outstanding a ruling [4] by respondent listing Ambijan as the appropriate recipient of gifts deductible for tax purposes. In the only instances where the pleadings raise this issue the question has already been decided in petitioners' favor. In those cases where the respective petitioner has the burden of proof, and as a consequence *290 has been denied the deduction, neither pleading, evidence, nor brief presents the question of the ruling itself, knowledge on the part of petitioners, reliance upon it by them, nor any other premises from which it can justifiably be concluded that the issue has been squarely presented and adequately supported. We prefer to postpone any decision in this field until a case arises in which both sides have been put upon notice and the record is clear and complete. James R. Parkey et al., 16 B.T.A. 441, 450; Louis Greenspon, supra. *291 IV. Respondent has also disallowed miscellaneous charitable contributions on similar ground of lack of substantiation. Petitioners have introduced no evidence with respect to these deductions and we assume that to that extent the issue has been abandoned. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Joseph Morgenstern and Bertha Morgenstern, Husband and Wife, Docket No. 39869; Elliott Morgenstern, Docket No. 39871; Elliott Morgenstern and Ruth Morgenstern, Husband and Wife, Docket No. 39872; Electroline Sales Company, Docket No. 39873; David Morgenstern, Docket No. 39875; and David Morgenstern and Hannah Morgenstern, Husband and Wife, Docket No. 39876.↩
*. Section 294(d)(1)(A), Internal Revenue Code of 1939↩. **. Section 294(d)(2), Internal Revenue Code of 1939↩.
*. Section 294(d)(1)(A), Internal Revenue Code of 1939↩. **. Section 294(d)(2), Internal Revenue Code of 1939↩.
2. Cohan v. Commissioner, (C.A. 2) 39 Fed. (2d) 540↩.
3. Internal Revenue Code of 1939: SEC. 101. EXEMPTIONS FROM TAX ON CORPORATIONS. The following organizations shall be exempt from taxation under this chapter - * * *
(6) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation; [The italicized portion originated in the Revenue Act of 1934.]↩
4. IT:RR:RFW Mailed Nov. 8, 1937 The American Committee for the Settlement of Jews in Birobidjan, Incorporated, 285 Madison Avenue, New York, New York. Sirs: Reference is made to the evidence submitted by you for use in determining your status for Federal income tax purposes. The evidence discloses that you were incorporated in 1935 under the laws of the State of New York. You were formed to, among other things, study and facilitate the settlement in the U.S.S.R., and primarily in Birobidjan, of Jews then residing in other countries and to render technical assistance to such settlers, and as far as possible to bring to such settlers the latest American discoveries and advances of technical knowledge pertaining to agriculture and industry. It appears that you are engaged in carrying out the purposes for which you were formed; that your income is used, or will be used, in helping destitute non-Russian Jews to settle in Birobidjan; and that none of your income may inure to the benefit of any private shareholder or individual. Based upon the facts presented, it is held that you are entitled to exemption under the provisions of section 101(6) of the Revenue Acts of 1934 and 1936. * * *
Contributions to your organization by individual donors are deductible by such individuals in arriving at their taxable net income in the manner and to the extent provided by section 23(o) of the Revenue Acts of 1934 and 1936. The deductibility of contributions by corporations is governed by section 23(q) of the Revenue Act of 1936. * * *
[This ruling was revoked by letter dated May 9, 1950. From 1937 until the issue of June 30, 1950, Ambijan was included in respondent's publication "Cumulative List of Organizations Contributions to Which Are Deductible."]↩